# UNITED STATES *v.* VALENZUELA-BERNAL

No. 81–450.   Argued April 20, 1982—Decided July 2, 1982

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and STEVENS, JJ., joined. BLACKMUN, J., *post*, p. 874, and O'CONNOR, J., *post*, p. 875, filed opinions concurring in the judgment. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 879.

*Carter G. Phillips* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen,* and *Deputy Solicitor General Frey.*

*Eugene G. Iredale* argued the cause for respondent. With him on the brief were *John J. Cleary* and *Craig E. Weinerman.*

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent, a citizen of Mexico, was indicted in the United States District Court for the Southern District of California for transporting one Romero-Morales in violation of 8 U. S. C. § 1324(a)(2). That section generally prohibits the knowing transportation of an alien illegally in the United States who last entered the country within three years prior to the date of the transportation.[1] Respondent was found guilty after a bench trial, but his conviction was overturned by the United States Court of Appeals for the Ninth Circuit. That court held that the action of the Government in deporting two aliens other than Romero-Morales violated respondent's right under the Sixth Amendment to the United States Constitution to compulsory process, and his right under the Fifth Amendment to due process of law. We granted certiorari in order to review the Court of Appeals' application of these constitutional provisions to this case, 454 U. S. 963 (1981),[2] and we now reverse.

I

Respondent entered the United States illegally on March 23, 1980, and was taken by smugglers to a house in Escondido, Cal. Six days later, in exchange for his not having to pay the smugglers for bringing him across the border, respondent agreed to drive himself and five other passengers to Los Angeles. When the car which respondent was driving

---

[1] Section 1324(a)(2) applies to "[a]ny person" who "transports, or moves, or attempts to transport or move," "any alien," "knowing that [the alien] is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior" to the transportation or attempted transportation with which the person is charged.

[2] Other Courts of Appeals have adopted slight variations of the position held by the Court of Appeals for the Ninth Circuit. See, e. g., *United States* v. *Armijo-Martinez*, 669 F. 2d 1131 (CA6 1982); *United States* v. *Rose*, 669 F. 2d 23 (CA1 1982); *United States* v. *Avila-Dominguez*, 610 F. 2d 1266 (CA5 1980); *United States* v. *Calzada*, 579 F. 2d 1358 (CA7 1978).

approached the Border Patrol checkpoint at Temecula, agents noticed the five passengers lying down inside the car and motioned to respondent to stop. Respondent accelerated through the checkpoint and was chased at high speed for approximately one mile before stopping the car and fleeing on foot along with the five passengers. Three of the passengers and respondent were apprehended by the Border Patrol agents.

Following their arrest, respondent and the other passengers were interviewed by criminal investigators. Respondent admitted his illegal entry into the country and explained his reason for not stopping at the checkpoint: "I was bringing the people [and] I already knew I had had it—too late—it was done." App. 27. The three passengers also admitted that they were illegally in the country and each identified respondent as the driver of the car. Id., at 66. An Assistant United States Attorney concluded that the passengers possessed no evidence material to the prosecution or defense of respondent for transporting illegal aliens, and two of the passengers were deported to Mexico. The third, Enrique Romero-Morales, was detained to provide a nonhearsay basis for establishing that respondent had transported an illegal alien in violation of 8 U. S. C. § 1324(a)(2).

Respondent moved in the District Court to dismiss the indictment, claiming that the Government's deportation of the two passengers other than Romero-Morales violated his Fifth Amendment right to due process of law and his Sixth Amendment right to compulsory process for obtaining favorable witnesses. He claimed that the deportation had deprived him of the opportunity to interview the two remaining passengers to determine whether they could aid in his defense. Although he had been in their presence throughout the allegedly criminal activity, respondent made no attempt to explain how the deported passengers could assist him in proving that he did not know that Romero-Morales was an illegal alien who had last entered the United States within the preceding three years.

At least one evidentiary hearing was held on respondent's motion, at which Romero-Morales testified that he had not spoken to respondent during the entire time that they were together. At the same hearing the Government offered, without obtaining agreement by respondent, to stipulate that none of the passengers in the car told respondent that they were in the United States illegally. The District Court denied respondent's motion and, following a bench trial on stipulated evidence, found respondent guilty as charged.[3]

The Court of Appeals reversed the conviction. The court relied upon the rule, first stated in *United States* v. *Mendez-Rodriguez*, 450 F. 2d 1 (CA9 1971), that the Government violates the Fifth and Sixth Amendments when it deports alien witnesses before defense counsel has an opportunity to interview them. 647 F. 2d 72, 73–75 (1981). Although it stated that a constitutional violation occurs only when "the alien's testimony could conceivably benefit the defendant," *id.*, at 74, the court's application of the "conceivable benefit" test demonstrated that the test will be satisfied whenever the deported aliens were eyewitnesses to the crime.[4] Respond-

---

[3] The joint appendix contains excerpts of transcribed testimony from a hearing on June 2, 1980, at which the District Court heard arguments of counsel and the testimony of Romero-Morales. At the conclusion of this testimony, counsel for respondent proposed the highly unusual step of calling the Assistant United States Attorney as a witness. App. 45. The attorney testified at further proceedings held on June 12, 1980, and was interrogated, *inter alia*, about his understanding of various decisions of the Court of Appeals for the Ninth Circuit and about the Government's litigating strategy in these cases. *Id.*, at 63–64. This procedure seems to us highly unusual, if not bizarre; ordinarily the litigating strategies of the United States Attorney are no more the subject of permissible inquiry by his opponent than would be the litigating strategies of the Public Defender by his opponent.

[4] As the Court of Appeals explained:

"The conceivable benefit in *Mendez-Rodriguez* stemmed from the fact that the deported aliens were eyewitnesses to, and active participants in, the crime charged, so that there was a strong possibility that they could have provided material and relevant evidence concerning the events constituting the crime. Conversely, where a missing deported alien was not an

ent's failure to explain what beneficial evidence would have been provided by the two passengers was thus inapposite, for "the deported aliens were eyewitnesses to, and active participants in, the crime charged, thus establishing a strong possibility that they could have provided material and relevant information concerning the events constituting the crime." *Id.*, at 75. Accordingly, the Court of Appeals held that respondent's motion to dismiss the indictment should have been granted by the District Court.

## II

We think that the decision of the Court of Appeals in this case, and some of the additional arguments made in support of it by respondent, misapprehend the varied nature of the duties assigned to the Executive Branch by Congress. The Constitution imposes on the President the duty to "take Care that the Laws be faithfully executed." U. S. Const., Art. II, § 3. One of the duties of the Executive Branch, and a vitally important one, is that of apprehending and obtaining the conviction of those who have violated criminal statutes of the United States. The prosecution of respondent is of course one example of the Executive's effort to discharge that responsibility.

---

eyewitness to the offense, we have been unwilling to assume that the alien's testimony could conceivably benefit the defendant." 647 F. 2d, at 74 (citation and footnotes omitted).

As described by the Court of Appeals, the "conceivable benefit" test "impose[s] no requirement of government misconduct or negligence before dismissal of an indictment is warranted. Nor is a defendant required to show specific prejudice caused by the unavailability of the alien eyewitnesses." *Ibid.* (citation omitted). Other Courts of Appeals have recognized the Ninth Circuit rule as requiring no showing of prejudice, *United States* v. *Calzada*, 579 F. 2d, at 1362, and as permitting dismissal of the indictment even when the " 'record is completely devoid of anything which would suggest that the testimony of any one, or more, of the deported persons would have been helpful' to the defendants." *United States* v. *Avila-Dominguez*, 610 F. 2d, at 1269–1270 (quoting *United States* v. *Mendez-Rodriguez*, 450 F. 2d 1, 6 (CA9 1971) (Kilkenny, J., dissenting)).

But the Government is charged with a dual responsibility when confronted with incidents such as that which resulted in the apprehension of respondent. One or more of the persons in the car may have violated the criminal laws enacted by Congress; but some or all of the persons in the car may also be subject to deportation as provided by Congress. The Government may, therefore, find itself confronted with the obligation of prosecuting persons in the position of respondent on criminal charges, and at the same time obligated to deport other persons involved in the event in order to carry out the immigration policies that Congress has enacted.

The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government. See *Mathews* v. *Diaz,* 426 U. S. 67, 81 (1976). "The Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens.'" *Kleindienst* v. *Mandel,* 408 U. S. 753, 766 (1972) (quoting *Boutilier* v. *INS,* 387 U. S. 118, 123 (1967)). In exercising this power, Congress has adopted a policy of apprehending illegal aliens at or near the border and deporting them promptly. Border Patrol agents are authorized by statute to make warrantless arrests of aliens suspected of "attempting to enter the United States in violation of . . . law," 8 U. S. C. § 1357(a)(2), and are directed to examine them without "unnecessary delay" to determine whether "there is prima facie evidence establishing" their attempted illegal entry. 8 CFR § 287.3 (1982). Aliens against whom such evidence exists may be granted immediate voluntary departure from the country. See 8 U. S. C. § 1252(b); 8 CFR § 242.5(a)(2)(i) (1982). Thus, Congress has determined that prompt deportation, such as occurred in this case, constitutes the most effective method for curbing the enormous flow of illegal aliens across our southern border.[5]

---

[5] As evidence of the effectiveness of Congress' policy and of the colossal problem presented by illegal entries from Mexico, the United States notes that approximately one million illegal aliens were detained by Border Pa-

In addition to satisfying immigration policy, the prompt deportation of alien witnesses who are determined by the Government to possess no material evidence relevant to a criminal trial is justified by several practical considerations. During fiscal year 1979, almost one-half of the more than 11,000 inmates incarcerated in federal facilities in the Southern District of California were material witnesses who had neither been charged with nor convicted of a criminal offense. App. 18. The average period of detention for such witnesses exceeded 5 days, and many were detained for more than 20 days. *Id.,* at 20. The resulting overcrowded conditions forced the Government to house many detainees in federal facilities located outside the Southern District of California or in state-operated jails. *Id.,* at 21–22; Brief for United States 19. Thus, the detention of alien eyewitnesses imposes substantial financial and physical burdens upon the Government, not to mention the human cost to potential witnesses who are incarcerated though charged with no crime. In addition, the rule adopted by the Court of Appeals significantly constrains the Government's prosecutorial discretion. As explained by the United States:

> "Because of budget limitations and the unavailability of adequate detention facilities, it is simply impossible as a practical matter to prosecute many cases involving the transportation or harboring of large numbers of illegal aliens, where all the aliens must be incarcerated for a substantial period of time to avoid dismissal of the charges, even though the prosecution's case may be overwhelming. As a consequence, many valid and appropriate prosecutions are foregone." *Id.,* at 21–22.

It simply will not do, therefore, to minimize the Government's dilemma in cases like this with statements such as "[t]he prosecution may not deny access to a witness by hiding

---

trol officials during each of the three years preceding 1981. Brief for United States 19; see U. S. Department of Justice, Internal Audit Report, U. S. Border Patrol Management of the Mexican Border 1, 6 (Jan. 1981).

him out.   See *Freeman* v. *State of Georgia*, 599 F. 2d 65 (5th
Cir. 1979) (police detective concealed location of witness)."
Brief for Respondent 35.   Congress' immigration policy and
the practical considerations discussed above demonstrate
that the Government had good reason to deport respondent's
passengers once it concluded that they possessed no evidence
relevant to the prosecution or the defense of respondent's
criminal charge.   No onus, in the sense of "hiding out" or
"concealing" witnesses, attached to the Government by rea-
son of its discharge of the obligations imposed upon it by Con-
gress; its exercise of these manifold responsibilities is not to
be judged by standards which might be appropriate if the
Government's only responsibility were to prosecute criminal
offenses.

## III

Viewing the Government's conduct in this light, we turn to
the evaluation of the Court of Appeals' "conceivable benefit"
test.   There seems to us to be little doubt that this test is a
virtual *"per se"* rule which requires little if any showing on
the part of the accused defendant that the testimony of the
absent witness would have been either favorable or material.
As we said with respect to a similar test—phrased in terms of
information "that might affect the jury's verdict"—for deter-
mining when a prosecutor must disclose information to a
criminal defendant:

> "If everything that might influence a jury must be dis-
> closed, the only way a prosecutor could discharge his
> constitutional duty would be to allow complete discov-
> ery of his files as a matter of routine practice."   *United
> States* v. *Agurs*, 427 U. S. 97, 109 (1976).

So it is with the "conceivable benefit" test.   Given the va-
garies of a typical jury trial, it would be a bold statement in-
deed to say that the testimony of any missing witness could
not have "conceivably benefited" the defense.   To us, the

number of situations which will satisfy this test is limited only by the imaginations of judges or defense counsel.[6]

## A

The only recent decision of this Court dealing with the right to compulsory process guaranteed by the Sixth Amendment suggests that more than the mere absence of testimony is necessary to establish a violation of the right.   See *Washington* v. *Texas,* 388 U. S. 14 (1967).   Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him "compulsory process for obtaining *witnesses in his favor."*   U. S. Const., Amdt. 6 (emphasis added).   In *Washington,* this Court found a violation of this Clause of the Sixth Amendment when the defendant was arbitrarily deprived of "testimony [that] would have been *relevant* and *material,* and . . . *vital* to the defense." 388 U. S., at 16 (emphasis added).   This language suggests that respondent cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of the passengers deprived him of their testimony.   He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.[7]

When we turn from *Washington* to other cases in what might loosely be called the area of constitutionally guaranteed access to evidence, we find *Washington's* intimation of a

---

[6] See n. 4, *supra.*

[7] That the Sixth Amendment does not guarantee criminal defendants the right to compel the attendance of any and all witnesses is reflected in the Federal Rules of Criminal Procedure.   Rule 17(b) requires the Government to subpoena witnesses on behalf of indigent defendants, but only "upon a satisfactory showing . . . that the presence of the witness is necessary to an adequate defense."   See also *Isaacs* v. *United States,* 159 U. S. 487, 489 (1895); *Crumpton* v. *United States,* 138 U. S. 361, 364–365 (1891).

materiality requirement more than borne out. *Brady* v. *Maryland*, 373 U. S. 83 (1963), held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, at 87. This materiality requirement was emphasized in *Moore* v. *Illinois*, 408 U. S. 786 (1972), where we stated that a defendant will prevail upon a *Brady* claim "where the evidence is favorable to the accused and is material either to guilt or to punishment." *Id.*, at 794. And in *United States* v. *Agurs, supra*, we noted that "[a] fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *Id.*, at 104. We further explained:

> "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. . . . This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.*, at 112–113 (footnotes omitted).

Similarly, when the Government has been responsible for delay resulting in a loss of evidence to the accused, we have recognized a constitutional violation only when loss of the evidence prejudiced the defense. In *United States* v. *Marion*, 404 U. S. 307 (1971), for example, the Court held that preindictment delay claims were governed by the Due Process Clause of the Fifth Amendment, not by the speedy-trial guarantee of the Sixth Amendment. Elaborating on the nature of the guarantee provided by the Due Process Clause

in such cases, the Court emphasized the requirement of materiality:

"Nor have appellees adequately demonstrated that the pre-indictment delay by the Government violated the Due Process Clause. No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." *Id.*, at 325.

Five Terms later, in *United States* v. *Lovasco*, 431 U. S. 783 (1977), we summarized this aspect of *Marion:*

"Thus *Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.*, at 790.

The same "prejudice" requirement has been applied to cases of postindictment delay. In *Barker* v. *Wingo*, 407 U. S. 514 (1972), the Court set forth several factors to be considered in determining whether an accused has been denied his Sixth Amendment right to a speedy trial by the Government's pretrial delay. One of the four factors identified by the Court, and a factor more fully discussed in *United States* v. *MacDonald*, 435 U. S. 850, 858–859 (1978), was whether there had been any "prejudice to the defendant from the delay." *Id.*, at 858. Although the Court recognized that prejudice may take the form of "'oppressive pretrial incarceration'" or "'anxiety and concern of the accused,'" the "'most serious'" consideration, analogous to considerations in this case, was impairment of the ability to mount a defense. See *ibid.* (quoting *Barker* v. *Wingo, supra,* at 532). Thus, other interests protected by the Sixth Amendment look to the degree of prejudice incurred by a defendant as a result of governmental action or inaction.

The principal difference between these cases in related areas of the law and the present case is that respondent simply had no access to the witnesses who were deported after he was criminally charged. Respondent contends that requiring him to show materiality is unreasonable in light of the fact that neither he nor his attorney was afforded an opportunity to interview the deported witnesses to determine what favorable information they possessed. But while this difference may well support a relaxation of the specificity required in showing materiality, we do not think that it affords the basis for wholly dispensing with such a showing.

The closest case in point is *Roviaro* v. *United States*, 353 U. S. 53 (1957). While *Roviaro* was not decided on the basis of constitutional claims, its subsequent affirmation in *McCray* v. *Illinois*, 386 U. S. 300 (1967), where both due process and confrontation claims were considered by the Court, suggests that *Roviaro* would not have been decided differently if those claims had actually been called to the Court's attention.

*Roviaro* deals with the obligation of the prosecution to disclose to the defendant the name of an informer-eyewitness, and was cast in terms of the traditional governmental privilege to refuse disclosure of such an identity. The *Roviaro* Court held that the informer's identity had to be disclosed, but only after it concluded that the informer's testimony would be highly relevant:

"This is a case where the Government's informer was the sole participant, other than the accused, in the transaction charged. The informer was the only witness in a position to amplify or contradict the testimony of government witnesses. Moreover, a government witness testified that [the informer] denied knowing petitioner or ever having seen him before. We conclude that, under these circumstances, the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee in the face of re-

peated demands by the accused for his disclosure." 353 U. S., at 64–65.

"What *Roviaro* thus makes clear is that this Court was unwilling to impose any absolute rule requiring disclosure of an informer's identity," *McCray* v. *Illinois, supra,* at 311, despite the fact that criminal defendants otherwise have no access to such informers to determine what relevant information they possess. *Roviaro* supports the conclusion that while a defendant who has not had an opportunity to interview a witness may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances it is of course not possible to make any avowal of *how* a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality.

In addition, it should be remembered that respondent was present throughout the commission of this crime. No one knows better than he what the deported witnesses actually said to him, or in his presence, that might bear upon whether he knew that Romero-Morales was an illegal alien who had entered the country within the past three years. And, in light of the actual charge made in the indictment, it was only the status of Romero-Morales which was relevant to the defense. Romero-Morales, of course, remained fully available for examination by the defendant and his attorney. We thus conclude that the respondent can establish no Sixth Amendment violation without making some plausible explanation of the assistance he would have received from the testimony of the deported witnesses.[8]

---

[8] Respondent's knowledge of the truth distinguishes this case from *United States* v. *Burr*, 25 F. Cas. 187 (No. 14,694) (CC Va. 1807), a case cited by respondent in support of his argument that it is unreasonable to require him to explain the relevance of the missing testimony. In *Burr*, Chief Justice Marshall found it unreasonable to require Aaron Burr to explain the relevancy of General Wilkinson's letter to President Jefferson,

## B

Having borrowed much of our reasoning with respect to the Compulsory Process Clause of the Sixth Amendment from cases involving the Due Process Clause of the Fifth Amendment, we have little difficulty holding that at least the same materiality requirement obtains with respect to a due process claim. Due process guarantees that a criminal defendant will be treated with "that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Lisenba* v. *California*, 314 U. S. 219, 236 (1941). In another setting, we recognized that Jencks Act violations, wherein the Government withholds evidence required by statute to be disclosed, rise to the level of due process violations only when they so infect the fairness of the trial as to make it "more a spectacle or trial by ordeal than a disciplined contest." *United States* v. *Augenblick*, 393 U. S. 348, 356 (1969) (citations omitted). Such an absence of fairness is not made out by the Government's deportation of the witnesses in this case unless there is some explanation of how their testimony would have been favorable and material. See *United States* v. *Lovasco*, 431 U. S. 783 (1977); *United States* v. *Marion*, 404 U. S. 307 (1971).

## IV

To summarize, the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution. The mere fact that the Government

upon which the President's allegations of treason were based, precisely because Burr had never read the letter and was unaware of its contents. In this case, respondent observed the passengers, heard their comments, and is fully aware of the ways in which they influenced his knowledge about the status of Romero-Morales.

deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment. A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense.

Because prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess, however, the defendant cannot be expected to render a detailed description of their lost testimony. But this does not, as the Court of Appeals concluded, relieve the defendant of the duty to make some showing of materiality. Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses. In some cases such a showing may be based upon agreed facts, and will be in the nature of a legal argument rather than a submission of additional facts. In other cases the criminal defendant may advance additional facts, either consistent with facts already known to the court or accompanied by a reasonable explanation for their inconsistency with such facts, with a view to persuading the court that the testimony of a deported witness would have been material and favorable to his defense.[9] Because in the latter situation the explanation of materiality is testimonial in nature, and constitutes evidence of the prejudice incurred as a result of the deportation, it should be verified by oath or affirmation of either the defendant or his attorney. See Fed. Rule Evid. 603; Fed. Rule Crim. Proc. 47.

As in other cases concerning the loss of material evidence, sanctions will be warranted for deportation of alien witnesses

---

[9] In adopting this standard, we express no opinion on the showing which a criminal defendant must make in order to obtain compulsory process for securing the attendance at his criminal trial of witnesses within the United States.

only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact. See *Giglio* v. *United States*, 405 U. S. 150, 154 (1972). In making such a determination, courts should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself. Because determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer ruling on motions until after the presentation of evidence.[10]

In this case the respondent made no effort to explain what material, favorable evidence the deported passengers would have provided for his defense. Under the principles set forth today, he therefore failed to establish a violation of the Fifth or Sixth Amendment, and the District Court did not err in denying his motion to dismiss the indictment. Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN, concurring in the judgment.

I concur in the judgment of the Court essentially for the reasons set forth by Judge Roney, in writing for a panel of the former Fifth Circuit, in *United States* v. *Avila-Dominguez*, 610 F. 2d 1266, 1269–1270, cert. denied *sub nom. Perez* v. *United States*, 449 U. S. 887 (1980). At least a "plausible theory" of how the testimony of the deported witnesses would be helpful to the defense must be offered. None was advanced here; therefore, the motion to dismiss the indictment was properly denied by the District Court.

---

[10] The counsel of *United States* v. *Agurs*, 427 U. S. 97, 112–113 (1976), is helpful here:

"[T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."

JUSTICE O'CONNOR, concurring in the judgment.

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington* v. *Texas*, 388 U. S. 14, 19 (1967).

In short, the right to compulsory process is essential to a fair trial. Today's decision, I fear, may not protect adequately the interests of the prosecution and the defense in a fair trial, and may encourage litigation over whether the defendant has made a "plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense." *Ante,* at 873. A preferable approach would be to accommodate *both* the Government's interest in prompt deportation of illegal aliens *and* the defendant's need to interview alien witnesses in order to decide which of them can provide material evidence for the defense. Through a suitable standard, imposed on the federal courts under our supervisory powers, a practical accommodation can be reached without any increase in litigation.

I

One cannot discount the importance of the Federal Government's role in the regulation of immigration.[1] As the Court points out, Congress and the Immigration and Naturalization Service, the agency authorized to make such policy decisions,

---

[1] Article I, § 8, cl. 4, states that Congress shall have the power "To establish an uniform Rule of Naturalization." See *Mathews* v. *Diaz,* 426 U. S. 67, 81 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"); *Galvan* v. *Press,* 347 U. S. 522, 531 (1954) ("that the formulation of [immigration] policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government").

have decided that prompt deportation is the appropriate response to the tremendous influx of illegal aliens. *Ante,* at 864. The Court is also correct that the Federal Government has legitimate reasons for reducing the number of illegal aliens detained for possible use as material witnesses. Particularly because most of the detained aliens are never called to testify, we should be careful not to permit either needless human suffering or excessive burdens on the Federal Government. Under these circumstances, courts should be especially circumspect about interfering with congressional judgments.

Nevertheless, the constitutional obligation of the Executive to "take Care that the Laws be faithfully executed," U. S. Const., Art. II, § 3, including the immigration laws, does not lessen the importance of affording the defendant the "fundamental fairness" inherent in due process, *Lisenba* v. *California,* 314 U. S. 219, 236 (1941). Moreover, the defendant's express right in the Sixth Amendment to compel the testimony of "witnesses in his favor," requires recognition of the importance, both to the individual defendant and to the integrity of the criminal justice system, of permitting the defendant the opportunity to interview eyewitnesses to the alleged crime. A governmental policy of deliberately putting potential defense witnesses beyond the reach of compulsory process is not easily reconciled with the spirit of the Compulsory Process Clause.

## II

The Court's solution to this apparent conflict between the Executive's duty to enforce the immigration laws and its duty not to impair the defendant's rights to due process and compulsory process is to permit the Government to deport potential alien witnesses, and to put the burden on the defendant of making a plausible showing that the deported aliens would have provided material and relevant evidence. The Court's approach thus permits the Government to make

a practice of deporting alien witnesses immediately, taking only the risk that the defendant will be able to show that the deported witnesses, whom the defendant's counsel never will be able to interview, would have provided useful testimony. In effect, to the extent that the Government has conflicting obligations, the defendant is selected to carry the burden of their resolution.

As the Court poses the issue today, the only alternatives are either to (1) permit routine deportation of witnesses and require the defendant to make some showing of prejudice, or (2) delay deportation so that defense counsel can interview the potential witnesses, and provide for automatic dismissal of the indictment if the witnesses are deported. There is, however, another alternative that would avoid unduly burdening either the Government or the defendant. The Court could require that deportation of potential alien witnesses be delayed for a very brief interval to allow defense counsel, as well as the Government, to interview them. That approach is somewhat similar to the Ninth Circuit's practice, originally described in *United States* v. *Mendez-Rodriguez*, 450 F. 2d 1 (1971). Under the holding in that case, illegal alien witnesses were held in custody for a short period, an average of five days, following the appointment of counsel. During that time, defense counsel had the opportunity to interview the witnesses and determine whether any of them might provide material and relevant evidence. Following the interviews, a Federal Magistrate held a hearing to determine whether any of the witnesses could provide material evidence, and ordered deportation of those aliens who could not provide such testimony. On those occasions when the Government nevertheless deported potential witnesses before the materiality hearing was held, the District Court determined whether the deported witnesses could have been of some "conceivable benefit" to the defendant. If the defendant met that standard, the court dismissed the indictment.

The principal difficulty with the Ninth Circuit's approach was, as the Court notes, *ante*, at 866–867, that it required virtually no evidence that the deported witness' testimony would have been material to the defense. Under the Ninth Circuit's formulation, the Government's deportation of an alien witness resulted in virtually an automatic dismissal of the indictment.

In adopting a standard requiring brief detention of potential alien witnesses, the Court need not take so extreme a position. In *United States* v. *Avila-Dominguez*, 610 F. 2d 1266 (1980), for example, the Fifth Circuit followed the Ninth Circuit's rationale in concluding that a defendant's constitutional rights are violated if the Government deports an alien witness before the defendant has had an opportunity to interview him. The court nevertheless affirmed the defendant's conviction because he could not offer a "plausible theory" explaining how the witness' testimony would have been helpful to the defense. *Id.*, at 1270. The court thus adopted a more stringent test than the Ninth Circuit's "conceivable benefit" test.

The standard I propose is an amalgam of the approaches used by the Fifth and Ninth Circuits.[2] As a matter of course, the deportable aliens who are potential witnesses should be detained for a very brief period to afford Govern-

---

[2] This Court has not hesitated to use its supervisory power over federal courts to set standards to ensure the fair administration of justice. For example, in *McCarthy* v. *United States*, 394 U. S. 459, 468–472 (1969), this Court, under its supervisory power, held that when a district court does not comply fully with Federal Rule of Criminal Procedure 11 in accepting a guilty plea, the plea must be set aside and the case remanded for the defendant to enter a new plea. The Court expressly rejected the rule, adopted by some Circuits, of holding a hearing to determine whether the defendant had entered his plea voluntarily with an understanding of the charge. See also *Marshall* v. *United States*, 360 U. S. 310, 313 (1959) (using this Court's "supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts" in setting aside a criminal conviction because several jurors had read inadmissible news accounts of the defendant's past activities).

ment and defense counsel the opportunity to interview them. If, within that period, the defendant requests that certain aliens not be deported, a federal magistrate should hold a hearing to determine whether deportation of any of the witnesses should be deferred until after trial. As evidenced by the statistics provided by the respondent, similar procedures in the Ninth Circuit have produced very little litigation. See Brief for Respondent 30. Of course, the Government could be expected to abide by such a rule, but in the occasional event that it deports alien witnesses without affording the defendant any opportunity to interview them, the defendant should not be entitled to an automatic dismissal of the indictment; nor should the defendant be expected to prove prejudice—after all, the Government has deported his potential witnesses. Instead, I agree with the Court that sanctions should be available against the Government if the defendant sets forth some plausible theory explaining how the deported witnesses would have provided material evidence that was not simply cumulative of evidence readily available to the defendant.

### III

In the case before us, the respondent made no plausible suggestion that the deported aliens possessed any material evidence that was not merely cumulative of other evidence. Under the standard I have proposed, the District Court properly denied the respondent's motion to dismiss the indictment. Accordingly, I concur in the judgment of the Court.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Today's holding flaunts a transparent contradiction. On the one hand, the Court recognizes respondent's constitutional right, under the Compulsory Process Clause of the Sixth Amendment, to the production of all witnesses whose testimony would be relevant and material to his defense. *Ante*, at 867–869. But on the other hand, the Court holds

that the Government may deport illegal-alien eyewitnesses to respondent's alleged crime immediately upon their apprehension, before respondent or his attorney have had any opportunity to interview them—thus depriving respondent of the surest and most obvious means by which he could establish the materiality and relevance of such witnesses' testimony. *Ante*, at 872–873. Truly, the Court giveth, and the Court taketh away. But surely a criminal defendant has a constitutional right to interview eyewitnesses to his alleged crime before they are whisked out of the country by his prosecutor. The Court's decision today makes a mockery of that right. Accordingly, I dissent.

The premise of the Court's holding is that "the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses," *ante*, at 872; this governmental power is conditioned only upon the Executive's "good-faith determination" that those witnesses possess "no evidence favorable to the defendant in a criminal prosecution," *ibid.* The Court sets up this asserted "responsibility" of the Executive Branch as a counterweight to its responsibility for "apprehending and obtaining the conviction of those who have violated criminal statutes of the United States." *Ante*, at 863. Thus the Court presents this case as involving a governmental "dilemma," *ante*, at 865, in which the Executive Branch is caught between the conflicting demands of its "dual responsibility," *ante*, at 864. This supposed "dilemma" is a pure figment of the Court's imagination, repudiated by our precedents and by common sense.

The Executive Branch has many responsibilities, any of which may conflict with its duty to enforce the federal criminal law. For example, the Executive Branch has an obvious and imperative obligation to preserve the national security. But when the Executive Branch chooses to prosecute a violation of federal law, it incurs a constitutional responsibility manifestly superior to its other duties: namely, the respon-

sibility to ensure that the accused receives the due process of law. The Government simply cannot be heard to argue that the criminal defendant's rights may be infringed because of the Executive Branch's "other responsibilities": Given the vast and manifold character of those responsibilities, to accept such an argument would be to accede to the rapid evisceration of the constitutional rights of the accused.

This point is hardly a novel one. In *Jencks* v. *United States*, 353 U. S. 657 (1957), we noted that "the protection of vital national interests may militate against public disclosure of documents in the Government's possession." *Id.*, at 670. But at the same time we noticed:

> "[I]n criminal causes, '. . . the Government can invoke its evidentiary privileges only at the price of letting the defendant go free. The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. . . .'" *Id.*, at 671, quoting *United States* v. *Reynolds*, 345 U. S. 1, 12 (1953).

We also quoted with approval from the opinion of the Court of Appeals for the Second Circuit in *United States* v. *Andolschek*, 142 F. 2d 503 (1944), in which Judge Learned Hand said:

> "While we must accept it as lawful for a department of the government to suppress documents, even when they will help determine controversies between third persons, we cannot agree that this should include their suppression in a criminal prosecution, founded upon those very dealings to which the documents relate, and whose criminality they will, or may, tend to exculpate. So far as they directly touch the criminal dealings, the prosecution necessarily ends any confidential character the docu-

ments may possess; it must be conducted in the open, and will lay bare their subject matter. The government must choose; either it must leave the transactions in the obscurity from which a trial will draw them, or it must expose them fully." *Id.*, at 506.[1]

The principle affirmed in these precedents is directly applicable to this case. Of course, the Government has a responsibility to execute our national immigration policy. But that responsibility does not conflict in the smallest degree with the Government's "duty to see that justice is done" to the criminal defendant whom it has chosen to prosecute. If the Government wishes to pursue criminal remedies against the accused, then its other "responsibilities" must yield before the rights to which an accused is constitutionally entitled.

Of course, the Government's duty to enforce the immigration laws should not be deferred indefinitely. But no inordinate delay is necessary in cases such as the one before us. The Southern District of California long ago adopted a procedure to enforce the *Mendez-Rodriguez* doctrine announced by the Court of Appeals for the Ninth Circuit in 1971.[2] The Southern District's procedure represents a practical and sensitive accommodation between a criminal defendant's constitutional rights under the Compulsory Process Clause and the Government's policy of prompt deportation of illegal aliens. Under that procedure, illegal-alien eyewitnesses are

---

[1] See *United States* v. *Beekman,* 155 F. 2d 580, 583–584 (CA2 1946). See also *United States* v. *Burr,* 25 F. Cas. 187, 191 (No. 14,694) (CC Va. 1807) ("If this might be likened to a civil case, the law is express on the subject. It is that either party may require the other to produce books or writings in their possession or power, which contain evidence pertinent to the issue. . . . [I]f the order be disobeyed by the plaintiff, judgment as in the case of a nonsuit may be entered against him"); *United States* v. *Nixon,* 418 U. S. 683, 709 (1974) ("To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or the defense").

[2] See *United States* v. *Mendez-Rodriguez,* 450 F. 2d 1 (CA9 1971).

held in custody for a short period of time—about 10 days— after appointment of counsel for the criminal defendant. At the end of that period, the United States magistrate holds a material witness bail review hearing, pursuant to 18 U. S. C. § 3149. In the intervening time, counsel for the defendant may interview the witnesses, and determine whether they can provide testimony material to the defense. At the hearing, both prosecution and defense are required to show the materiality of each of the detained witnesses, or they are released and deported. Brief for Respondent 6–7; Brief for United States 13–14, 18. If this traditional Southern District procedure had been adhered to in the present case, the Government would have clearly discharged its constitutional obligation to afford respondent an opportunity to develop evidence bearing upon the materiality of the testimony of the witnesses to his alleged offense. In contrast, the Court permits the Government to adopt a wholly unilateral procedure that deprives respondent and future criminal defendants of any such opportunity.

The Court suggests that a criminal defendant should be able to "demonstrate either the presence or absence of the required materiality" even without having had an opportunity to interview the detained eyewitnesses. *Ante*, at 871. But this notion has been flatly rejected by our precedents. *Roviaro* v. *United States*, 353 U. S. 53 (1957), denied the Government's claimed privilege to withhold the identity of its informer, "John Doe," from the petitioner.[3] *Roviaro*, like respondent in the present case, was "present throughout the commission of this crime." *Ante*, at 871; see 353 U. S., at 64 ("So far as [Roviaro] knew, he and John Doe were alone and unobserved during the crucial occurrence for which he was

---

[3] *Roviaro* represented an exercise of our supervisory jurisdiction. See *McCray* v. *Illinois*, 386 U. S. 300, 309 (1967). But as the Court concedes, *ante*, at 870, *Roviaro* would not have been decided differently if the Due Process and Confrontation Clause claims implicit in that case had been brought to the fore.

indicted"). But the Court in *Roviaro* refused to say, as the Court does today, that a criminal defendant "can establish no Sixth Amendment violation without making some plausible explanation of the assistance he would have received from the testimony" that he seeks. *Ante*, at 871. Rather, the Court in *Roviaro* required disclosure simply because John Doe's testimony *"might* have been helpful to the defense." 353 U. S., at 63–64 (emphasis added).

> "Doe had helped to set up the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment. He might have thrown doubt upon petitioner's identity or the identity of the package [of heroin]. He was the only witness who might have testified to petitioner's possible lack of knowledge of the contents of the package that he 'transported' . . . to John Doe's car. The desirability of calling John Doe as a witness, *or at least interviewing him in preparation for trial, was a matter for the accused rather than the Government to decide."* *Id.*, at 64 (emphasis added).

Like Doe in *Roviaro*, the illegal aliens deported by the Government in the present case "played a prominent part" in respondent's alleged offense—if, indeed, they did not help to set it up without the knowledge of respondent. And they, like Doe, might have testified to respondent's "possible lack of knowledge" respecting essential elements of the crime charged against him.[4] Under *Roviaro, respondent,* not the

---

[4] In order to obtain a conviction under 8 U. S. C. § 1324(a)(2), quoted *ante*, at 860, n. 1, the Government was required to show (1) that respondent transported an alien within the United States, (2) that the alien had not been lawfully admitted or was not lawfully entitled to enter, (3) that this was known to respondent, (4) that respondent knew that the alien's last entry was within three years, and (5) that respondent acted willfully in furtherance of the alien's violation of the law. *United States* v. *Gonzalez-Hernandez*, 534 F. 2d 1353, 1354 (CA9 1976). Since the third and fourth

Government, was entitled to decide whether or not the illegal-alien eyewitnesses in this case could give testimony material and relevant to the defense.

I dissent.

---

elements of this statutory requirement bear upon respondent's state of mind, it is plain that the illegal aliens whom respondent was transporting might very well have been able to testify to his lack of knowledge on these critical points.