**Robert A. McROBERTS, Jr.,**

v.

**Donald CLUSEN, Superintendent of the State of Wisconsin, Green Bay Reformatory.**

No. 85–C–281.

United States District Court, E.D. Wisconsin.

Aug. 20, 1986.

Cletus R. Williams, Jr., Kenosha, Wis., for petitioner.

Stephen W. Kleinmaier, Asst. Atty. Gen., Madison, Wis., for respondent.

DECISION AND ORDER

CURRAN, District Judge.

Robert A. McRoberts, Jr., the petitioner in the above-captioned action, is seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. McRoberts was tried by jury in the Circuit Court for Kenosha County, Wisconsin, with the Honorable Richard

G. Harvey, Jr., presiding, after being arraigned for the January 26, 1981, murders of his grandmother, Alice Easton, and two war veterans who boarded at her house—John Amann and Raphael Petrucci. Their bodies had been found with multiple stab wounds and it appeared that a purse and jewelry box in the house had been ransacked. On January 16, 1982, the jury returned a verdict finding the defendant guilty of three counts of first-degree murder in violation of section 940.01(1) of the Wisconsin Statutes and of one count of armed robbery in violation of section 943.-32(1)(a)(2). On February 18, 1982, the court entered a judgment of conviction, then sentenced McRoberts to three consecutive terms of life imprisonment in the Wisconsin state prisons for the three murder convictions and to a twenty year term for armed robbery to be served concurrently with the other sentences.

In his petition McRoberts raises three grounds for attacking his conviction: (1) the trial court denied his constitutional right to subpoena and use a witness at trial; (2) his due process rights were violated at sentencing because the trial court's decision was motivated by improper considerations; and (3) his arrest violated his rights under the Fourth and Fourteenth Amendments. After the respondent pointed out that McRoberts' Fourth Amendment claim is precluded because he already had a full and fair opportunity to litigate it during state proceedings, the petitioner agreed to relinquish his third ground for relief. *See* Memorandum in Support of Petition for Writ of Habeas Corpus at 2.

The trial court denied McRoberts' post-conviction motions dealing with the remaining issues in a March 14, 1983, decision. On February 14, 1984, the Wisconsin Court of Appeals upheld the conviction in an unpublished opinion. *See State v. McRoberts,* 118 Wis.2d 820, 346 N.W.2d 470 (1984). Finally, the Wisconsin Supreme Court denied the petition for review. *See State v. McRoberts,* 118 Wis.2d 828, 352 N.W.2d 212 (1984). Thus, it appears that McRoberts has exhausted his available state remedies and is entitled to proceed with his petition for habeas corpus. *See* 28 U.S.C. § 2254(b) & (c).

■ As his first ground for relief, the petitioner asserts that he was denied his Sixth Amendment right to call Randall Schaumberg, Sr. to testify in his defense. The Wisconsin Court of Appeals recounted the events leading up to the exclusion of this witness:

At trial, one of the prosecution witnesses, Randall Schaumberg, Jr. testified he had been with McRoberts until 3:20 or 3:30 a.m. on the morning in question. This testimony was in contradiction to a previous statement he had given to the police indicating he had only been with McRoberts until 2:30 a.m. Schaumberg, Jr.'s trial testimony was beneficial to the defense because a neighbor had previously testified that she had seen someone pull down the kitchen shade at the Easton residence at approximately 2:50 to 3:00 a.m. that morning. Schaumberg, Jr.'s testimony that he was with McRoberts until 3:30 a.m. tended to cast doubt upon the possibility that McRoberts was the 3:00 a.m. intruder.

When questioned on the inconsistency of his two statements, Schaumberg, Jr. explained he had recently spoken to his father and had been told he did not return home until 3:30 a.m. During this testimony, his father, Randall Schaumberg, Sr., was sitting in the courtroom.

After Schaumberg, Jr. finished testifying, the defense counsel attempted to have the father called as a witness to corroborate the son's testimony. The prosecution resisted this request on several grounds. The trial court refused to allow the elder Schaumberg to testify.

*State v. McRoberts,* 118 Wis.2d 820, 346 N.W.2d 470 (1984).

The Court of Appeals then held that the trial court had abused its discretion by failing to take a less drastic approach and that its comments on the record indicating a belief that the elder Schaumberg would commit perjury to protect his son were

improper. The appellate court reasoned that:

> A trial court does not have the authority in a jury trial to exclude witnesses it anticipates will commit perjury. The determination of a witness's credibility and the weight to be given his testimony properly rests with the jury. *Roach v. Keane*, 73 Wis.2d 524, 536, 243 N.W.2d 508, 515 (1976). The prosecution could easily have attacked Schaumberg, Sr.'s testimony during cross-examination by questioning him on his prior statement given to the police that his son came home at 2:00 a.m. It then would have been the jury's function to determine which was more credible, Schaumberg, Sr.'s police statement or his trial testimony. The trial court usurped the jury's role by drawing conclusions as to Schaumberg, Sr.'s credibility prior to his testifying.

In the end, however, the court concluded that these errors were harmless beyond a reasonable doubt in view of the overwhelming evidence of the defendant's guilt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

In ruling on this petition, the court must presume that the facts relied upon by the state appellate court are correct. *See* 28 U.S.C. § 2254(d). *See also United States ex rel. Jones v. DeRobertis*, 766 F.2d 270, 273 (7th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986). Neither of the parties have disputed these facts or requested an evidentiary hearing. They have, however, submitted copies of the transcripts of the pretrial, trial, and posttrial proceedings from which this court can make additional findings. *See Townsend v. Sain*, 372 U.S. 293, 315, 83 S.Ct. 745, 758, 9 L.Ed.2d 770 (1963). Having reviewed these materials, the court finds that the record as it stands provides a sufficient basis upon which this court can rule on the issues of law presented by this petition. *See generally Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Rogers v. Israel*, 746 F.2d 1288 (7th Cir.1984). When, as here, the issues involve federal constitutional rights, federal law must be applied. *See Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969); *Joyner v. King*, 786 F.2d 1317, 1321 (5th Cir.1986).

The petitioner urges this court to adopt the court of appeals' conclusion that the trial court erred in refusing to allow him to call Randall Schaumberg, Sr. as a witness. In response, the respondent points out that the court of appeals did not characterize the exclusion of Schaumberg, Sr. as constitutional error but as an "abuse of discretion" in making an evidentiary ruling. The respondent contends, therefore, that, "even if the trial court abused its discretion under state evidentiary standards, the trial court's ruling did not violate the petitioner's constitutional right to call witnesses." Memorandum in Opposition to Petition for Writ of Habeas Corpus at 5.

The right to call witnesses derives from the Sixth Amendment guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The Sixth Amendment right to compulsory process is incorporated in the Due Process Clause of the Fourteenth Amendment, and so also applies in state criminal trials. *Washington v. Texas*, 388 U.S. 14, 17–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019 (1967). Compulsory process implicitly prevents the state from arbitrarily excluding testimony. "The Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use." *Id.* at 23, 87 S.Ct. at 1925. The defendant's general Fourteenth Amendment right to due process also restrains the operation of state rules of evidence. Due process "is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). State evidentiary rules "may not be applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 S.Ct. at 1049.

In this case the trial judge refused to let McRoberts call Schaumberg, Sr. because the defense failed to file a notice of alibi and failed to list Schaumberg, Sr. as a witness in response to the state's discovery demand and because neither party saw to it that Schaumberg, Sr. was excluded from the courtroom in compliance with the sequestration order. However, a number of comments made on the record by the trial judge indicate that the overriding reason that Schaumberg, Sr.'s testimony was excluded was that the judge had already concluded that the proposed witness would commit perjury. *See* Transcript of Trial at 54–65 (January 13, 1982). The judge also expressed concern that Schaumberg, Sr. would have to be warned of his right not to incriminate himself before being allowed to testify. The defendant's counsel vigorously opposed this proposal, saying it would interfere with the witnesses' "spontaneous testimony." *Id.* at 61.

In *Washington v. Texas,* the Supreme Court said that a defendant must make a showing that he was deprived of testimony that would have been relevant, material and vital to his defense in order to establish a Sixth Amendment violation. 388 U.S. at 16, 87 S.Ct. at 1921. *See also United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982); *United States v. Davis,* 772 F.2d 1339, 1348 (7th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985). In this case the prosecution relied on circumstantial evidence to establish the approximate time of the three homicides. The scientific evidence was far from conclusive. Dr. John Sanson, a coroner's pathologist in Kenosha County, attempted to estimate the time of death based on the effects of rigor mortis and temperature upon the corpses. His observations led to this bizarre exchange:

Q: Doctor, then in your opinion if Mr. Amann, Mr. Petrucci and Mrs. Easton were found at 10:00 o'clock on the night, the preceding night, your opinion would in fact, say that they could have been alive after they were actually found, is that right?

A: That's right.

Trial Transcript at 52 (January 9, 1982). In an attempt to establish the time of death the prosecution called Angela Maurer, a neighbor of the victims, who testified that between 2:45 and 3:00 A.M. on the night in question she had noticed that her neighbor's shade had been drawn. *Id.* at 325 (January 11, 1982). She remembered that she had only seen that shade drawn on one previous occasion. *Id.* at 316. Later, Randall Schaumberg, Jr. was called by the state and testified that he had been with McRoberts until 3:20 A.M. on the night in question. *Id.* at 48 (January 13, 1982).

After hearing this testimony, the defendant advised the court that he wanted to call Schaumberg's father in his case-in-chief. In his offer of proof, McRoberts stated that he expected Schaumberg, Sr. to corroborate his son's testimony as to the time he arrived at home. *Id.* at 57. Thus, Schaumberg, Sr.'s testimony could have been relevant to establishing the whereabouts of the defendant after the time Mrs. Maurer noticed the drawn shade.

A party challenging the exclusion of a witness must also show that the witnesses' testimony would have been material and vital to his defense. In *United States v. Valenzuela-Bernal,* the Supreme Court rejected the "conceivable benefit" test for materiality and relied on the following, more stringent, definition:

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt ... This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

458 U.S. at 868, 102 S.Ct. at 3447, quoting *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342

(1976). *See also Sharlow v. Israel*, 767 F.2d 373, 377–78 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986).

Evaluating the exclusion of Schaumberg, Sr.'s testimony within the context of the entire record presented here, the court concludes that, although this witnesses' testimony was expected to be favorable to the defense, the loss of the evidence did not prejudice the defense to the extent that the trial was rendered fundamentally unfair. Both the trial judge and the court of appeals noted that the evidence of guilt was overwhelming. The most persuasive evidence of guilt was the defendant's own voluntary statement given to the authorities after proper *Miranda* warnings. Kenosha Sheriff's Detective Robert Hubbard testified that McRoberts told him that he had gone to his grandmother's home on January 26 when the victims were alive, but had left after they were bloodied and dead. Although he did not admit killing his grandmother and her two boarders, he was able to tell the detective where to find the alleged murder weapon. This weapon—a Bowie knife—was found in a wooded area some miles from the death scene just as the defendant described. *See* Trial Transcript at 83–92 (January 13, 1982). It was wrapped in two lavender washcloths which the defendant's mother identified as belonging to her. In addition, blood matching McRoberts' blood type was found at the scene on the walls and in the kitchen sink. His fingerprint was found on the same kitchen windowshade which Mrs. Maurer had noticed drawn. When officers searched McRoberts' home, they found blood on his car and on some money stuffed in his pillowcase. The arresting officers noted that the defendant exhibited cuts and scratches on his left hand, which had been bandaged.

The court cannot envision that the testimony of Schaumberg, Sr. could have raised a reasonable doubt concerning McRoberts' guilt in the minds of the jurors faced with the weight of this evidence. Schaumberg, Jr. had already been impeached with his prior inconsistent statement as to the time he had arrived at home on the night in question. Shortly after the homicides, Schaumberg, Jr. signed a sworn statement stating that McRoberts had dropped him off at home at 2:30 A.M. after the two spent the night with friends watching M.A.S.H., Benny Hill and the Three Stooges and smoking marijuana. At trial Schaumberg, Jr. testified that he had lied in his written statement and that shortly before trial (and at least eleven months after the incident) he had been reminded by his father that he had actually arrived home at about 3:30. Schaumberg, Sr. was expected to corroborate his son's latest version of the facts and it should have been the province of the jury to decide whether or not to believe him. The court of appeals has already pointed out that it was an abuse of discretion for the trial judge to exclude Schaumberg, Sr. The trial judge preempted the fact-finding role of the jury without so much as conducting a voir dire of the proffered witness. "[I]t is a rare case in which a witness's testimony is not fit to be heard by a jury, and ... such a determination is not to be lightly made." *United States v. Davis*, 772 F.2d 1339, 1344 (7th Cir.1985). In this case it appears that the judge's decision was not lightly made. In his decision on the posttrial motions, the judge explained that:

> This issue was carefully and deliberately considered before I ruled.... Randy Schaumberg, Jr. had given a statement to police, orally, and in writing on January 30, 1981, very soon after the murders. He did not realize at the time that the time of 2:30 a.m., when he left the defendant would be important. His father, Randy, Sr., and mother, also gave a statement closely corroborating Randy, Jr., but stating the time to be 2:00 a.m. He and Mrs. Schaumberg were interviewed shortly after Randy, Jr. on February 7, 1981.

> Later, at the urging or coaching of someone, Randy switched his story, and so did his father.

> Mr. Willems, defense counsel, learned about the switch a month before the tri-

al. This placed him in a dilemma. With Randall, Jr. being ready to switch stories, he would be worthless as an alibi witness, because his credibility was bound to be shattered and impeached, with his written statement. Mr. Willems put it somewhat amusingly, when he said he wanted an opportunity to "patch up his (Randy Jr.'s) credibility." As I put it at the time, it would have been necessary to use a U.S. Navy "collision mat" to patch up Randy Jr.'s credibility. (These are quilted canvas mats about 15 or 20 feet in diameter used to make emergency repairs when a hole has been made in the side of a ship.)

Randy Jr.'s manner on the stand was not only abrasive, but impudent. He openly admitted, in an apparent attempt to justify his switch, that the statement he gave the police was not true (a year later he recollected the *truth*, of course!)

Now Randy's father was another story switcher. His memory, like his son's, miraculously improved some months after he gave Detective Loewen a statement along with Mrs. Schaumberg.

No one in his right mind would expect Mr. Schaumberg, Sr. to contradict his son's testimony. He reminds me of the old Anglo-Saxon "oath-helpers" whose function was to swear that a witness had told the truth (no matter what he testified to).

If Schaumberg, Sr. told the truth, he would reveal his son as a perjuror; if he switched his story like Randy Jr. then he too became a perjuror.

Defense counsel knew what this precious pair was going to do a month before the trial. Mr. Willems is too competent an attorney to try to create an alibi with two witnesses who might be termed "veracity cripples". Such a ploy would only have inculpated his client instead of exculpating him. Mr. Willems ran a very credible bluff on this issue; he must be an excellent poker player.

The reasons for exclusion of the testimony of Randall Schaumberg, Sr. were, one, he was not a rebuttal witness; two, Mr. Willems did not list him as a poten-

tial witness; three, Mr. Willems was not surprised by the turn of events with Randall, Jr.; he knew about it at least a month before trial; four, Mr. Willems tried to force the State to name an exact time when the murders were committed, which the State could not do; five, Mr. Willems had access to all the crucial police reports, and witness statements months before the trial; six, Mr. Willems did not give notice of alibi, probably because he knew he could not prove it with two noncredible witnesses.

Decision on Post Conviction Motions at 2–3 (March 14, 1983).

But, although the trial court's action may have been an abuse of discretion, it does not rise to the level of a constitutional violation. This court concludes that, based on the record as a whole, the exclusion of the testimony of Schaumberg, Sr. did not deprive McRoberts of his Sixth Amendment right to present a witness in his favor. It is doubtful that he could have rehabilitated his son's credibility. "Courts treat recantation and claims of perjury with great skepticism even under the best of circumstances." *United States ex rel. Jones v. DeRobertis*, 766 F.2d at 272. But regardless of whether the jury would have believed the elder Schaumberg, the other evidence of guilt was insurmountable. Therefore, the writ will not issue on McRoberts' Sixth Amendment claim.

■ The second issue raised by McRoberts in his petition is whether his due process rights were violated because the trial judge improperly took into consideration his belief that several of the witnesses had committed perjury. In explaining his reasons for imposing sentence, the trial judge stated:

That is what we have here, a prime example of the grossest selfishness. Robert had to have the money from grandmother and the mother testified that she had given him lots of money. He had to support his marijuana habit and whatever else he was using and there are indications of LSD and other things and those

were a selfishness he put on himself. I believe in free will. If we don't have free will, forget anything. Feelings must control themselves, must repress their desires and selfishness, but Robert couldn't do it or didn't want to do it probably. Think of the hellish scene on the second floor of that house where grandma received 20 stab wounds and these poor innocent veterans were finished off and there was a picture that was so bad that no one would have had to put that in front of the jury because it would have been prejudicial. Now, I also in the matter of attitude, during the trial I think six witnesses changed their stories on crucial points. As I have said sometimes if memory were water, we would have been swimming. I have considered the seriousness of the crime, the necessity for protecting the public and the possibility for any rehabilitation of this man and that must be subordinated to the other considerations. I will say I have meditated seriously combinations of this sentence. I can't see how you can depreciate the value of one life or another and so I am now prepared to administer the sentence. Let me say one thing further before I do. I not only have no doubt as to the guilt of the defendant, I don't have a shred not even a doubt that his statement in the Police Department at the time he was arrested was very close to a full confession.

Transcript of Sentencing at 11–12 (February 18, 1982).

During the hearing on postconviction motions when the defendant raised the issue of whether the witnesses' possible perjury was improperly considered as a sentencing factor, the trial judge explained his comments:

Well, I could say that is extremely far-fetched. I just wanted them to know that I wasn't—that I didn't believe their perjury. That is, by that, I don't think it affected the outcome at all on my sentencing. As I had said to myself in a different case, I don't know if I used that here, but if perjury had been water we would have been swimming in the court-room. That's what happened in that case, and I didn't—I just was giving my disapproval of perjury which I think is something I don't want to condone. He didn't have anything to do with it. How could he? He was in jail. I have my own ideas about who did it, but I'm not saying anything about that; and I don't care, and I don't charge the people, although I actually meditated asking the district attorney to investigate and probably see if there was a basis for perjury against a couple of those witnesses.

I don't remember just who, but I was astonished at their guts in coming into court and perjuring themselves as they did. Now, that's true, but that was a different situation. I don't just don't like people getting on the stand and take the oath and then like [sic] like the blazes as they did.

So, it's not Mr. McRoberts' fault. He didn't do it. He couldn't have done it, and whoever did it will remain nameless as far as I'm concerned; but I don't think it's any secret to a lot of people.

Transcript of Hearing on Postconviction Motions at 44–45 (February 23, 1983).

Later, in his March 14, 1983, written decision on these posttrial motions, the trial judge denied McRoberts' motion for a reduction of sentence, saying:

The objection to my reference to perjury is without merit. I was satisfied that six witnesses testified falsely under oath to try to help Robert. I refer to Judy McRoberts, Peggy McRoberts, Howard Callahan, Mark Rogers, Randall Schaumberg, Jr. and Cathy Hill. Except for Howard Callahan, their credibility was openly destroyed by previous interviews or statements given police. Their story switches were crude, and glaringly apparent.

The court reporter made an error in the transcript of the sentencing. What I actually said was: "If perjury were *water*, we would have all been swimming."

I knew the perjury was not instigated by the defendant; he had been in jail

since the murders. I knew Mr. Willems did not have any part in generating the perjury, although he must have become aware of the plan as the trial approached. I have never had any criticism of Mr. Willems' behavior, ethics, or conduct before, at or after the trial, and I don't have any now.

I feel the perjury was planned by members of Robert's family. It was a crude and stupid ploy, which probably injured the defendant's very minimal chance for an acquittal, which could only have resulted from induced confusion in the minds of the jurors.

The perjury did not have a feather's weight in determining Robert's sentence; I just wanted the perjurors to realize that they didn't fool me or the jurors.

I refuse to change the sentences I gave Robert McRoberts. There is no merit to the objections to the sentences. I feel the sentences were and are necessary to protect the public from Robert. I believe he could easily kill again if the opportunity were available, and he considered killing necessary or desirable at the time.

Decision on Post Conviction Motions at 6–7 (March 14, 1983).

Based on the trial judge's statements at the sentencing hearing and his later explanation of his remarks, this court concludes that the defendant's contention that he was denied due process is without merit. The defendant cites *Harris v. Prast*, 459 F.Supp. 303 (E.D.Wis.1978) for the proposition that it is improper for a judge to enhance a sentence merely because he has an unsupported belief that the defendant has suborned perjury from other witnesses. *Id.* at 305. However, the facts of *Harris* are not analogous to the facts in McRoberts' situation. The *McRoberts* trial judge never intimated that McRoberts himself procured the perjury of the witnesses. As the Wisconsin Court of Appeals pointed out, the sentencing narrative reveals that the judge relied on legally relevant factors such as the seriousness of the crimes, lack of remorse, and the need to protect society in sentencing McRoberts. *See State v. McRoberts*, 118 Wis.2d 820, 346 N.W.2d 470, slip op. at 14–15 (1984). Moreover, the sentence of three consecutive life terms plus one concurrent twenty-year term was not the maximum the court could have imposed. The judge could have ordered the twenty-year sentence for armed robbery to be served consecutive to the other sentences. A sentencing court has wide discretion in deciding what factors it considers salient and in setting a sentence within the statutory limits. *See generally United States v. Gomez*, 797 U.S. 417 (7th Cir.1986); *United States v. Marquardt*, 786 F.2d 771 (7th Cir.1986). In this case there is no reasonable basis to believe that the court abused its discretion or violated the defendant's right to due process. Thus, a writ will not issue on this ground.

### ORDER

For the reasons explained above, the court ORDERS that Robert A. McRoberts, Jr.'s Petition for a Writ of Habeas Corpus (filed February 27, 1985) IS DENIED.

IT IS FURTHER ORDERED that this action IS DISMISSED.