649 S.E.2d 258

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Anthony Ray WHITT, Defendant Below, Appellant.**

No. 33039.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 24, 2007.

Decided April 6, 2007.

Dissenting Opinion of Justice Maynard April 10, 2007.

has been expanded to include an assessment of Dr. Rhee.

Gregory L. Ayers, Deputy Public Defender, Office of the Public Defender, Charleston, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Dawn E. Warfield, Deputy Attorney General, Charleston, for the Appellee.

ALBRIGHT, Justice:

Anthony Ray Whitt appeals from his conviction for second degree murder on the grounds that he was denied his constitutional right to compulsory process [1] when the trial court denied his request to call his co-defendant, Lori Day, to the stand. Ms. Day, who had been acquitted of the murder charges filed against her by the time of Appellant's trial, indicated through counsel that she intended to invoke the Fifth Amendment if called to testify at Appellant's trial. Based on its determination during an *in camera* hearing that Ms. Day's reliance on the Fifth Amendment was improper, the trial court found Ms. Day in contempt. Refusing to purge herself of the contempt finding, Ms. Day was incarcerated in the county jail for the duration of Appellant's trial. After carefully examining Appellant's constitutional right to compel witnesses to testify in conjunction with the invalid Fifth Amendment privilege asserted by Ms. Day,[2] we conclude

---

**1.** *See* W.Va. Const. art. III, § 14 (requiring that criminal defendant be awarded "compulsory process for obtaining witnesses in his favor"); *accord* U.S. Const. amend. VI.

**2.** Because Ms. Day had already been acquitted

that the trial court erred by refusing to permit Appellant to call Ms. Day to the stand. Accordingly, we reverse and remand this matter for a new trial.

## I. Factual and Procedural Background

Appellant and his girlfriend Lori Day resided at the War Drive–In ("Drive–In"), a public bar and grill in McDowell County, West Virginia, that includes a private section where family members reside. During the winter months, Dorothy Mitchell, the victim in this case, lived at the Drive–In. She was the long-time mistress of Appellant's father. Before Ms. Day moved in with Appellant,[3] the victim and Appellant reportedly had a close and loving relationship.[4] Witnesses testified at trial that Appellant and the victim never argued; they always greeted each other with a hug and a kiss; and that Appellant was always doing things for Dorothy Mitchell, who had helped raise him since birth.

From all accounts, the relationship between Ms. Day, the first woman who had "fallen in love" with Appellant, and the victim was strained, at best.[5] During the week before the murder, Ms. Day left a note for Appellant in which she asked him to "have a talk with that bitch and tell her to stay off my ass before I flip completely out." The note also stated that "I have took all of her s——t that I'm going to take and if I say anything about it, then I won't be able to stay here with you. I'd have to go back to Newhall." Two weeks before the murder[6] of Ms. Mitchell, Ms. Day complained to Appellant's sister, Polly Whitt, about having to do the dishes. She stated that "if that damned old woman [victim] didn't leave me alone, I'm going to knock her brains out." Less than twenty-four hours before the homicide, Ms.

Day complained in a similar vein to Deborah Hall, a neighbor, about Ms. Mitchell and the household chores, commenting that "she was going to do something about it." Just hours before the actual murder, Ms. Day visited the trailer beside the Drive–In where Ed Pierson and Bobby Frazier were watching the Super Bowl. According to Mr. Pierson, Ms. Day was very emotional and stated that "she was going to take something and beat her [Ms. Mitchell's] brains out." Mr. Frazier testified that Ms. Day had tears in her eyes during this same visit and said angrily "if Dorothy [Mitchell] don't get off my back and let me alone, I'm going to knock her ... brains out."

Sometime in the early morning hours of January 29, 2001, Dorothy Mitchell died from a fractured skull, which was caused by a blow from a blunt object. According to Appellant, he first learned about Ms. Mitchell's death when he discovered Ms. Day in the victim's bedroom in the early morning hours on January 29, 2001. Ms. Day was reportedly stuffing the victim's clothes in garbage bags and the victim was lying on the floor wrapped in a blanket. Ms. Day purportedly told Appellant that she and the victim had been arguing about Ms. Day's children and that she had accidentally killed her.[7] When Appellant suggested that they call an ambulance, Ms. Day reportedly implored, "no, I am pregnant with your baby," and insisted that "they will hurt me if you do." Appellant testified that he cried, went to the bathroom and vomited. According to his testimony, Ms. Day convinced Appellant not to call the rescue squad based on her alleged pregnancy. She also persuaded him to help her dispose of the body. Appellant testified that after they took the body outside to place it in his broth-

---

and could not be charged again with murder based on principles of double jeopardy, she did not have a valid Fifth Amendment right to assert.

3. This occurred about three months prior to the murder of Ms. Mitchell.

4. In his confession to the police, Appellant stated that the victim was "just like a mother to him" and that "I killed somebody I loved."

5. Apparently, the source of the discord between Ms. Mitchell and Ms. Day centered on Ms. Mitch-

ell's expectation that Ms. Day should perform certain household chores, such as washing dishes.

6. The murder occurred on January 29, 2001.

7. Ms. Day was purportedly upset over a phone call that the victim received on January 23, 2001, from Ms. Day's sister-in-law concerning Ms. Day's children and specifically, Ms. Day's fitness as a parent. Ms. Day was ostensibly angered by the fact that Ms. Mitchell related the substance of the phone conversation concerning her alleged parental unfitness to the rest of the household.

er's car, he got sick again. Appellant and Ms. Day drove to the dump where they deposited both the victim and the bags containing her clothing.

Appellant testified that Ms. Day concocted a story to tell the family about the victim informing them in the middle of the night that she was leaving for a few days. During the days after the victim's disappearance, Appellant's father was extremely upset over the disappearance of Ms. Mitchell. After several days of unsuccessfully trying to convince Ms. Day to confess, Appellant testified that he was distraught over what should be done. Five days after the victim's disappearance and her death, Appellant confessed to the murder.

In explanation of why he confessed to the murder, Appellant testified that he decided to falsely take the blame for the victim's murder because "everybody was hurting," Ms. Day was not going to confess, and he wanted Ms. Mitchell to have a proper burial. So Appellant told his father that he and Ms. Mitchell had argued and that in the course of the argument he had accidentally killed her. He told his father that he grabbed Ms. Mitchell and shook her, choked her, and then she fell and hit her head on the night stand. After providing his father with this explanation, his father accompanied him to the local sheriff's office where he made the purported false confession.[8] After giving this confession in which he repeated the story he told his father, he took the sheriff and other law enforcement officers to the location where Ms. Mitchell's body had been dumped—an illegal dump site on Coaldale Mountain under a pile of trash.

According to his testimony, Appellant first realized that he had been lied to by Ms. Day about the events that transpired on the night of the victim's death when he learned that the medical examiner's findings[9] regarding the cause of Ms. Mitchell's death were inconsistent with his confession. Wanting to get things straightened out, Appellant had his attorney contact the State Police so that he could give another statement describing what

really happened on the night of Ms. Mitchell's death. In this statement, Appellant stated that he had been tricked by Ms. Day into confessing to the crime and he repeatedly denied killing the victim.

At trial, several witnesses offered evidence that corroborated Appellant's version of the events. Jennifer Ray, who was incarcerated with Ms. Day at the Southern Regional Jail, testified that Ms. Day confessed to her that she hit the victim in the head with a baseball bat and that Appellant's only involvement in the crime was his assistance in trying to cover it up after the fact. Ms. Day reportedly told Ms. Ray that Appellant "was so in love with her that she could convince 'Mose' [Appellant] to do anything for her." Ms. Ray testified that Ms. Day also told her that she stopped Appellant from calling the rescue squad by telling him she was pregnant.

Jessica Mullens, another inmate who came into contact with Ms. Day at the regional jail, testified that Ms. Day told her she hit the victim with a baseball bat above the left ear and then took a pillow and "finished the stupid b———ch off." Ms. Day purportedly told Ms. Mullens that Appellant had helped her put the body in the car and throw the bags of clothing over the hill, but that he had not done anything else. Just as she had reportedly indicated to Ms. Ray, Ms. Day told Ms. Mullens that she had told Appellant she was pregnant to forestall him from contacting the authorities. Ms. Mullens testified that Appellant kept trying to get Ms. Day to go to the police and that Ms. Day retorted with comments that if he loved her, he would not say anything about what happened. When cross-examined as to Ms. Day's statements to her, Ms. Mullens explained that although Ms. Day initially told her that Appellant and his father killed the victim, she later changed her story and stated two or three times that she alone killed Ms. Mitchell.

In addition to confessing to Ms. Ray and Ms. Mullens, Ms. Day reportedly confessed to Tina Ashworth, the girlfriend of Appel-

---

8. This videotaped confession was played for the jury.

9. The cause of death determined by the medical examiner was blunt force trauma to the left side of the head from being struck with a blunt object.

lant's brother. According to Ms. Ashworth, Ms. Day told her during a jail visit that she killed the victim, but did not indicate how the murder occurred. Later, however, Ms. Day recanted that account, stating . instead that Appellant's father or someone else was involved with the murder. Just before being arrested for the murder of Ms. Mitchell, Ms. Day confessed to her cousin, Donna Brewster, but also implicated Appellant in the murder. At trial, Ms. Brewster was allowed to testify [10] that Ms. Day told her that she and Appellant both killed the victim. According to this narrative, Appellant hit the victim in the head with a baseball bat and then he and Ms. Day both smothered Ms. Mitchell with a pillow.

In an attempt to establish his innocence, Appellant subpoenaed Ms. Day as a witness for his trial. The trial court was informed by Ms. Day's counsel that she intended to invoke the Fifth Amendment if called to the stand to testify. After holding an *in camera* hearing to address this issue, the trial court informed Ms. Day that she did not have a Fifth Amendment privilege against self-incrimination due to her acquittal and the complete immunity from prosecution she had been granted. Ms. Day nonetheless refused to testify. Consequently, the trial court found Ms. Day in contempt and ordered her to be jailed. Ms. Day was informed that she could purge herself of the contempt by agreeing to testify. Counsel for Appellant moved that the trial court advise the jury of Ms. Day's refusal to testify but the court refused this motion on the grounds that it would lead to speculation on the jury's part. During the trial, Appellant's counsel asked to call Ms. Day to the stand, but the trial court again refused this request.

After hearing the testimony of all the witnesses including Appellant, the jury convicted Appellant of the lesser-included offense of second degree murder. By order of January 13, 2003,[11] Appellant was sentenced to a forty-year term in prison following the denial of

his motion for a new trial. This Court granted Appellant's petition for appeal [12] solely to address whether the trial court's refusal to call Ms. Day as a witness violated his constitutional right to compulsory process given her invalid assertion of the privilege against self-incrimination under the Fifth Amendment.

## II. Standard of Review

■ We have recognized that "a trial judge may not make an evidentiary ruling which deprives a criminal defendant of certain rights, such as the right ... to offer testimony in support of his or her defense ... which [is] essential for a fair trial pursuant to the due process clause found in the Fourteenth Amendment of the *Constitution of the United States* and article III, § 14 of the *West Virginia Constitution*." Syl. Pt. 3, in part, *State v. Jenkins*, 195 W.Va. 620, 466 S.E.2d 471 (1995). Our review of the constitutional issue raised in this case is plenary. *See* Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."); *accord Phillip Leon M. v. Greenbrier County Bd. of Educ.*, 199 W.Va. 400, 404, 484 S.E.2d 909, 913 (1996) (observing that "interpretations of the West Virginia Constitution, along with interpretations of statutes and rules, are primarily questions of law"). With these standards in mind, we proceed to determine whether an error of constitutional magnitude was committed in this case.

## III. Discussion

### A. Right to Compulsory Process

■ In syllabus point three of *State v. Harman*, 165 W.Va. 494, 270 S.E.2d 146 (1980), we held that "[u]nder the Sixth Amendment to the United States Constitution and Article III, Section 14 of the West Virginia Constitution, the defendant has a

---

**10.** These statements of Ms. Brewster were admitted under the hearsay exception that allows the admission of statements against penal interest. *See* W.Va.R.Evid. 804(b)(3).

**11.** Appellant was resentenced on June 7, 2005, for the purposes of extending his appeal period to allow this appeal to be timely filed.

**12.** Appellant's appeal was granted by order of March 2, 2006.

constitutional right to have compulsory process for obtaining witnesses in his favor ...." In announcing that the right to compulsory process is a fundamental right, we cited the United States Supreme Court's recognition in *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), that

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 19, 87 S.Ct. 1920. Appellant contends that the right to compulsory process must involve as a corollary the right to actually compel testimony. *See Taylor v. Illinois*, 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) ("The right to compel the witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact.").

■ In arguing that his right to compulsory process was denied, Appellant relies heavily on the *Harman* decision issued by this Court. In *Harman*, the defendant was denied the right to call an alleged accomplice to the witness stand for the stated purpose of demonstrating that the defendant and the alleged accomplice did not match the physical description of the two persons described as having been at the scene of the crime. 165 W.Va. at 501–02, 270 S.E.2d at 151. The issue we examined in *Harman* was whether a witness could avoid permitting the jury to observe his physical characteristics by invoking the Fifth Amendment protection against self-incrimination. *Id.* at 502, 270 S.E.2d at 152. Because a defendant is not entitled to rely on the Fifth Amendment privilege to prevent the jury from viewing his or her physical characteristics, we reasoned in *Harman* that a witness was not entitled to broader constitutional protections than a defendant. *Id.* at 503–04, 270 S.E.2d at 152.

Recognizing the well-accepted rule that a witness does not have the right to refuse to take the stand, we stated the following:

> "[B]y universal holding, one not an accused must submit to inquiry (including being sworn, if the inquiry is one conducted under oath) and may invoke the privilege [Fifth Amendment] only after the potentially incriminating question has been put. Moreover, invoking the privilege does not end the inquiry and the subject may be required to invoke it as to any or all of an extended line of questions."

*Harman*, 165 W.Va. at 504, 270 S.E.2d at 153 (quoting *McCormick, Evidence* § 136 (2d ed.1972)). Accordingly, we determined in *Harman* that the trial court had committed reversible error by allowing the alleged accomplice to refrain from taking the witness stand based on his invocation of a Fifth Amendment privilege. 165 W.Va. at 504, 270 S.E.2d at 153.

Relying on *Harman*, Appellant argues that Ms. Day was similarly not permitted to refuse to take the witness stand based on her stated intent to invoke the privilege against self-incrimination upon being called to the stand. In light of her previous acquittal for first degree murder and the trial court's grant of complete immunity, Appellant maintains that Ms. Day could not be placed in jeopardy for any offenses arising from or pertaining to the victim's murder.

### B. Testimony Must Be Material and Favorable

■ The State argues that Appellant cannot succeed on his constitutional claim because he made no showing of how Ms. Day's testimony would have been either material or favorable to his defense. In seeking to raise constitutional concerns regarding the right to compel testimony, the State correctly observes that a defendant must demonstrate more than just the absence of testimony.

The only recent decision of this Court dealing with the right to compulsory process guaranteed by the Sixth Amendment suggests that more than the mere absence of testimony is necessary to establish a violation of the right. Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure

the attendance and testimony of any and all witnesses; it guarantees him "compulsory process for obtaining witnesses in his favor." In *Washington [v. Texas]*, this Court found a violation of this Clause of the Sixth Amendment when the defendant was arbitrarily deprived of "testimony [that] would have been relevant and material, and ... vital to the defense." This language suggests that respondent cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of the passengers deprived him of their testimony. *He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.*

*U.S. v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (citations omitted and emphasis supplied).

Elaborating on the materiality requirement, the United States Supreme Court recognized in *Valenzuela–Bernal* that "'implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.'" *Id.* at 868, 102 S.Ct. 3440 (quoting *U.S. v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). In *Valenzuela–Bernal*, the Supreme Court refused to waive the required demonstration of materiality where the witness was truly unavailable for interviewing because of deportation, saying

> that while a defendant who has not had an opportunity to interview a witness may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances it is of course not possible to make any avowal of *how* a witness may testify. *But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality.*

458 U.S. at 871, 102 S.Ct. 3440 (emphasis supplied). Thus, despite the absence of a

witness interview, a proffer can still be made to the trial court for the purpose of establishing whether the witness' testimony has the capacity to be both material and favorable to the defendant.

■■■■ Emphasizing that Appellant made no efforts to interview Ms. Day to determine the nature of her testimony, the State argues that Appellant failed to make the requisite showing that Ms. Day's testimony would have been material and favorable to his defense. In explanation of this shortcoming, Appellant's counsel stated during oral argument before this Court that Ms. Day's counsel denied him the opportunity to interview Ms. Day because of her co-defendant status. As opposed to the situation where the nature of the witness' testimony is truly unknowable,[13] the reason Appellant sought to call Ms. Day to the stand is clear: to establish that Ms. Day was the perpetrator of Ms. Mitchell's death. Without question, the law requires that to establish the denial of the right to compulsory process afforded to criminal defendants pursuant to article III, section 14 of the West Virginia Constitution, there must be a showing that the witness' testimony would have been both material and favorable to the defense. For purposes of establishing a denial of the right to compulsory process, a proffer regarding the events to which the witness might testify along with a demonstration of the relevance of such testimony may be relied upon to meet the requisite showing that the testimony would have been both material and favorable to the defense where circumstances prevent a criminal defendant from interviewing a witness.

What Appellant sought to establish through Ms. Day's testimony was certainly material to his defense to the murder charge and her testimony could have been favorable to his case had she chosen to take the stand and testify in accordance with his version of what happened on the night that Ms. Mitchell was murdered. Because Ms. Day had

**13.** As the United States Supreme Court acknowledged in *Valenzuela–Bernal*, the demonstration of materiality can be established even where circumstances prevent a witness from being interviewed. 458 U.S. at 871, 102 S.Ct. 3440 (explaining that despite inability to "make any avowal of *how* witness may testify" in absence of interview, materiality may nonetheless be demonstrated by proffer of events to which witness might testify and relevance of such events to crime).

told more than one person that she, rather than Appellant, was the person who actually killed Ms. Mitchell, and described the use of a blunt instrument (a baseball bat) to kill the victim, there is little question that Ms. Day's testimony could have been both material and favorable to Appellant, had she chosen to testify in open court to the same account of events she offered to Ms. Ray and Ms. Mullens. Thus, we do not find Appellant's failure to interview Ms. Day under the facts of this case to be fatal to his need to demonstrate that her testimony, provided it was elicited in open court, could have been both material and favorable to Appellant's defense.[14]

**C. Inference From Refusal to Testify**

Having decided that Ms. Day's testimony was potentially both material and favorable to Appellant, we must now address whether constitutional error occurred in this case by virtue of the trial court's decision not to call Ms. Day to the stand. The trial court explained that its decision not to call Ms. Day to the stand was motivated out of concern that her refusal to testify "would lead to speculation on the part of the jury." Appellant argues that he was entitled to whatever inference that Ms. Day's silence might have lodged in the jury's collective mind.

In support of his position, Appellant cites both state and federal decisions in which tribunals have held that a witness' refusal to testify may be considered by the jury.[15] *See, e.g., People v. Lopez,* 71 Cal.App.4th 1550, 84 Cal.Rptr.2d 655, 658 (1999) (recognizing that

where witness has no constitutional or statutory right to refuse to testify, jurors are entitled to draw negative inference from witness' refusal to testify). Arguably the most apposite of the decisions relied upon by Appellant[16] is *Gray v. State,* 368 Md. 529, 796 A.2d 697 (2002). In *Gray,* the appellate court concluded that where the defendant produces evidence that a witness committed the crime for which the defendant is being tried, the trial court has the discretion to compel the witness to invoke his or her Fifth Amendment privilege against self-incrimination in front of the jury. *Id.* at 717–18. In crafting a limited exception to the general rule in criminal cases that a witness may not be forced to invoke the Fifth Amendment before the jury, the court held in *Gray* that under certain circumstances a defendant in a criminal case may call a witness before the jury to invoke the privilege against self-incrimination. 796 A.2d at 717. In explanation of its ruling, the court reasoned in *Gray:*

> We believe that a trial court has some discretion to consider permitting a defendant in a criminal case to call a witness to the stand to invoke his Fifth Amendment privilege in the presence of the jury if the trial court first determines whether sufficient evidence has been presented, believable by any trier of fact, of the possible guilt of the witness the defendant wants to cause to invoke his Fifth Amendment privilege before the jury. *The court, in the exercise of that discretion, must consider, as well, the prejudice to the defense of not*

**14.** At the same time, we recognize that even if Ms. Day had been called to the stand, she may have similarly ended up being held in contempt of court without having provided the testimony that Appellant sought to elicit from her. That, however, is not the concern at which the demonstration of materiality and favorability is aimed; the objective of such an evidentiary showing is to require that a defendant citing constitutional error under the Sixth Amendment must first prove that the testimony at issue had relevance to the defense of his case.

**15.** *Baxter v. Palmigiano,* 425 U.S. 308, 319, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (recognizing that "in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause" and allowing adverse inference from inmate's silence at prison disciplinary proceeding); *accord U.S. ex*

*rel. Bilokumsky v. Tod,* 263 U.S. 149, 153–54, 44 S.Ct. 54, 68 L.Ed. 221 (1923) (stating that "[s]ilence is often evidence of the most persuasive character"); *Gray v. State,* 368 Md. 529, 796 A.2d 697 (2002) (holding that trial court has discretion to permit defendant to call accused witness to stand and permit witness to invoke Fifth Amendment privilege in front of jury where entire defense was centered on witness' commission of crime); *see also* Syl. Pt. 9, *State ex rel. Myers v. Sanders,* 206 W.Va. 544, 526 S.E.2d 320 (1999) (holding that trial court may draw adverse inference from habeas petitioner's silence as result of Fifth Amendment invocation during deposition).

**16.** We note with appreciation that the State acknowledges *Gray v. State,* 368 Md. 529, 796 A.2d 697 (2002), as authority that is counter to its position.

*allowing the potentially exculpatory witness to invoke his Fifth Amendment privilege in the presence of the jury.* In opining that such discretion exists, we note that such testimony, if permitted, might be subject to the same restraints that a trial judge normally may exercise as to relevancy, repetitiveness, and the like.

*Id.* at 714 (emphasis added).

The rationale enunciated by the court in *Gray* for permitting a witness to invoke his Fifth Amendment privilege in the jury's presence was concern that prohibiting an in-court invocation would unfairly prejudice the defendant in the presentation of his defense. *Id.* at 716. In circumstances where the defense argues that the witness who seeks to invoke the Fifth Amendment is the singularly culpable person and the defendant fails to question the alleged culpable person about the crime in the jury's presence, the court reasoned in *Gray* that the jury may wrongly infer that the defendant's defense is frivolous or insincere. *Id.* at 714; *see also U.S. v. Deutsch*, 987 F.2d 878, 884 (2nd Cir.1993) (recognizing danger of unfair prejudice resulting from Fifth Amendment invocation in jury's presence "is not so great *when the defense rather than the Government seeks to draw inferences from a witness's silence*") (emphasis supplied); *U.S. v. Vandetti*, 623 F.2d 1144, 1149 (6th Cir.1980) (identifying trial court's concern in deciding whether to permit individual to take witness stand who refuses to testify as *"prejudice which may result to a defendant* from inferences which may be drawn if a witness takes the fifth amendment") (emphasis supplied); *U.S. v. Reyes*, 362 F.3d 536, 541 (8th Cir.2004) (contrasting government's use of privilege invocation against defendant to defendant's use of inference from witness' privilege invocation and observing that Constitution forbids adverse inferences in the former situation because such inferences burden defendant's right not to incriminate himself).

Based on these considerations, the court felt compelled in *Gray* to establish an exception to the general rule against invoking the Fifth Amendment in the jury's presence that would apply to cases where the defense is inextricably linked to convincing the jury that another person committed the crime for which the defendant is on trial. In such instances, the Maryland appellate court suggested the following procedures be applied:

When a defendant proffers a defense that the crime was committed by another person and the defendant wants to call as a witness that person only to invoke his Fifth Amendment privilege against self-incrimination on the witness stand in the presence of the jury, the trial court, on the record, should make a determination of whether sufficient other evidence has been proffered that, if believed by any trier of fact, might link the accused witness to the commission of the crime. If the trial court finds that such sufficient evidence, linking the accused witness to the crime and believable by any trier of fact, exists that could possibly cause any trier of fact to infer that the witness might have committed the crime for which the defendant is being tried, then the trial court has the discretion to permit, and limit as normally may be appropriate, the defendant to question the witness, generally, about his involvement in the offense and have him invoke his Fifth Amendment right in the jury's presence.

796 A.2d at 717; *see also Simmons v. State*, 392 Md. 279, 896 A.2d 1023, 1032 (2006) (discussing applicability of exception adopted in *Gray* ).

The protections outlined by the court in *Gray* appear to properly limit the exception's extension to only those cases where there is sufficient evidence to suggest a probable basis for linking the accused witness to the crime. In defining what qualifies as sufficient evidence, the court in *Gray* stated that "sufficient" implies that amount of evidence which is adequate for a given purpose. 796 A.2d at 716 (quoting *Black's Law Dictionary* 1447 (7th ed.1999)). In further explanation of what would qualify as sufficient evidence under this rule, the court elucidated that "[s]ufficient evidence must be presented so that any trier of fact might possibly and reasonably believe that the proposed witness might have committed the crime instead of the defendant." 796 A.2d at 716. We note additionally that such evidence is subject to

the same procedures and protections which govern the introduction of all types of evidence, testimonial or otherwise, at trial. *See Gray*, 796 A.2d at 714 (noting that concerns regarding relevancy and repetitiveness apply to introduction of such evidence); *Reyes*, 362 F.3d at 541 (observing that evidentiary rules limit compulsory-process rights of defendant); *see also State v. Sale*, 110 Hawai'i 386, 133 P.3d 815, 822 (2006) (rejecting application of *Gray* based on state evidentiary rule that expressly proscribes inference from privilege assertion).

### D. Fifth Amendment

In *State v. Haverty*, 165 W.Va. 164, 267 S.E.2d 727 (1980), we recognized how an individual's right to invoke the Fifth Amendment privilege against self-incrimination may conflict with a defendant's right to compel that same individual to be a witness in his behalf under the Sixth Amendment. *Id.* at 170, 267 S.E.2d at 731. One way that this conflict may be resolved, as we discussed in *Haverty*, is through a grant of immunity. This need for a grant of immunity arises by virtue of the fact "that the Sixth Amendment right to compulsory process for a criminal defendant include[s] not only the right to subpoena the witness, but also to have him testify." *Id.* at 171, 267 S.E.2d at 731–32 (citing *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019). We observed in *Haverty* that a trial court has the discretion under West Virginia Code § 57–5–2 to determine whether immunity should be extended to a particular witness based on a determination "that the ends of justice may be promoted by compelling such testimony or evidence." 165 W.Va. at 172, 267 S.E.2d at 732. In this case, the trial court made the determination required by West Virginia Code § 57–5–2 that the interests of justice required a grant of immunity to Ms. Day so that she could freely offer her testimony without fear of additional prosecution for any events associated with the murder of the victim.

When Ms. Day refused to testify despite a grant of immunity, the trial court decided that putting her on the stand solely to allow her to state "I take the Fifth" in response to the State's questions would wrongly inject the potentially improper element of inference into the jury's deliberative process. So instead of calling her to the stand, the trial court allowed Ms. Day to sit in jail pursuant to a contempt ruling. While the State argues there was nothing more the trial court could have done to protect Appellant's rights once Ms. Day refused to testify at the *in camera* proceeding, Appellant retorts that not until a witness actually takes the stand and is presented with questions by counsel does the court or counsel know for certain that the witness will refuse to testify. *See Hoffman v. U.S.*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) (recognizing that trial court has duty to determine whether witness' silence is properly grounded in Fifth Amendment and to require witness to answer where refusal to testify is not warranted); *see also In Re Anthony Ray Mc.*, 200 W.Va. 312, 322, 489 S.E.2d 289, 300 (1997) (recognizing that " 'an ordinary witness may decline to answer only after making the requisite showing of the danger of self-incrimination' ") (quoting Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, vol. 1, § 5–2(c) at 479 (1994)). Suggesting that Ms. Day might have changed her mind if called to the stand and instructed that she did not have a valid Fifth Amendment privilege to invoke, Appellant maintains that it was precipitous on the trial court's part to assume that she would refuse to testify in open court. We agree.

As the trial court correctly recognized during the *in camera* hearing, the Fifth Amendment privilege that Ms. Day was citing as a basis for not taking the witness stand was not available to her given both her acquittal and the grant of immunity extended to her. Following her acquittal, any lingering concerns that Ms. Day may have had with regard to self-incrimination were entirely extinguished by the grant of immunity. Because Ms. Day did not have a valid Fifth Amendment right to invoke in the first instance and because she had no legitimate fear of further prosecution given the grant of immunity, her refusal to testify was indefensible. While there are clearly valid reasons for not wanting to call a witness to the stand solely to give her the opportunity to invoke the privilege against self-incrimination, those

concerns, as discussed in section III.C. of this opinion, do not unequivocally countenance against requiring a witness to take the stand.

The State maintains that regardless of the validity of the Fifth Amendment privilege, the trial court should not call a witness to the stand for the singular purpose of exercising this right in the jury's presence. *See U.S. v. Griffin*, 66 F.3d 68, 70 (5th Cir.1995) (holding that Sixth Amendment only requires that witness be brought to court, not that he be required to take witness stand after refusing to testify and observing that "[i]t is irrelevant whether the witness's refusal is grounded in a valid Fifth Amendment privilege, an invalid privilege, or something else entirely"); *see also Martin v. U.S.*, 756 A.2d 901, 905 (D.C.2000) (recognizing that policy reasons undergirding assertion of Fifth Amendment privilege outside jury's presence apply even if privilege is invalid). Those courts that require the assertion of the privilege outside the jury's presence adhere to this practice as a means of preventing the jury from drawing any improper inferences from the witness' decision to exercise his constitutional privilege. *See Bowles v. U.S.*, 439 F.2d 536, 541 (C.A.D.C.1970) (recognizing concerns that invocation of Fifth Amendment in jury's presence "will have a disproportionate impact on their deliberations" and identifying principle that guilt may not be inferred from exercise of privilege as underpinning of rule that jury should not draw inferences from witness' decision to exercise constitutional privilege against self-incrimination); *U.S. v. Johnson*, 488 F.2d 1206, 1211 (1st Cir.1973) (stating that "[n]either side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him").

In the State's view, invocation of the Fifth Amendment privilege in the jury's presence should categorically not be permitted under the facts of this case based on the possibility that the deliberative process will be influenced by inference. Yet, as the court made clear in *Gray*, numerous appellate courts grant trial courts the discretion to decide whether a witness may be called to the stand

to invoke the Fifth Amendment. *See* 796 A.2d at 716–17 and cases cited therein; *cf.* 796 A.2d at 717 n. 19 (identifying courts viewing issue as non-discretionary); *see also Griffin*, 66 F.3d at 70 n. 6 (cautioning that "[o]ur holding should not be taken to mean that a court may never grant such a request [Fifth Amendment's invocation in jury's presence], but only that the Sixth Amendment does not require that it do so"). Because the right to a fair trial necessarily includes the right to offer testimony in support of a defendant's defense and because in some instances silence may constitute favorable evidence to a defendant, we reach a different result than the State when weighing the defendant's right to compel a witness unwilling to testify to take the stand against the possibility that the deliberative process will be affected by inference. *See Jenkins*, 195 W.Va. at 628, 466 S.E.2d at 479.

■■■■■ As this case aptly demonstrates, an exception to the general rule against allowing a witness to take the stand solely for the purpose of exercising his or her Fifth Amendment privilege against self-incrimination may be warranted in cases where the testimony sought to be compelled by a defendant in a criminal case is exculpatory in nature. We think that the facts of this case strongly countenance application of an exception similar to the rule adopted by the Maryland appellate court in *Gray*. *See* 796 A.2d at 714. Accordingly, we hold that where a defendant in a criminal case seeks to call a witness to the stand who intends to invoke his or her Fifth Amendment privilege against self-incrimination and the defendant has presented sufficient evidence to demonstrate the possible guilt of the witness for the crime the defendant is charged with committing, the trial court has the discretion to compel such witness to invoke his or her Fifth Amendment privilege in the presence of the jury. In making its decision as to whether a witness should be called to the stand for the purpose of invoking his or her Fifth Amendment privilege against self-incrimination, the trial court should consider whether the defendant will be unfairly prejudiced by not allowing the potentially exculpatory witness to invoke this privilege in the jury's presence.

### E. Denial of Defense

Because Appellant was permitted to fully relate his version of the events that transpired on the night of Ms. Mitchell's death and to introduce testimony in support of his theory of the case, the State argues that he was not prejudiced by Ms. Day not being called to the witness stand. We are concerned, however, that by denying Appellant the opportunity to call Ms. Day to the stand, he was effectively denied the right to fully present his defense. *See Gray*, 796 A.2d at 716 (recognizing that exercise of trial court's decision regarding witness' invocation of Fifth Amendment in jury's presence requires consideration of defendant being "entitled to have his defense fully presented to the jury"). Given the factual circumstances of this case, the absence of Ms. Day from the witness stand may have affected the jury's willingness to believe Appellant's version of the facts.

In considering whether Ms. Day should have been called to the stand, it is significant that Appellant's initial confession expressly conflicts with the medical examiner's findings regarding the victim's cause of death. The fact that Appellant changed his statement upon learning of the actual cause of death tends to support that he was in the proverbial dark with regard to what really happened on the night of Ms. Mitchell's murder. In contrast, the confessions purportedly made by Ms. Day to Ms. Ray and Ms. Mullens, appear to comport with Appellant's theory of the case—that Ms. Day was the person who fatally struck the victim with a blunt object and that he just helped her move and hide the body. Additional evidence that points to Ms. Day, rather than Appellant, having committed the murder includes testimony introduced regarding the longstanding close relationship that the victim and Appellant shared, as well as the number of statements that Ms. Day made to third parties concerning her intention to cause harm to Ms. Mitchell. Because this evidence, when viewed cumulatively, provides an arguably credible link between Ms. Day and the murder, it appears to be the type of "sufficient other evidence" that may constitute a proper foundational basis for allowing a trial court to exercise its discretion to require an accused witness to take the stand despite the witness' intention of responding to propounded questions by invoking the Fifth Amendment. *Gray*, 796 A.2d at 717.

In response to the State's contention that Appellant fully presented his theory of the case to the jury, we cannot conclude that the trial court's refusal to permit Appellant to call Ms. Day to the stand was harmless. *See Jenkins*, 195 W.Va. at 628, 466 S.E.2d at 479. Simply put, we cannot be certain that the jury would not have viewed Appellant's theory of the case in a different light had Ms. Day taken the stand and either responded to questions posed by defense counsel or refused to testify in the jury's presence. Based on the specific circumstances present in this case, an acquitted co-defendant who refused to testify despite a grant of immunity combined with sufficient evidence suggesting that the co-defendant may have been the sole perpetrator of the crime at issue, we conclude that to deny Appellant the right to call Ms. Day to the stand effectively denied to him the right to fully present a defense.

Weighing the harm of introducing Ms. Day's potential silence to the jury versus the harm of denying to Appellant any potential benefit from that anticipated silence, compels us to conclude that Appellant was unfairly prejudiced by the trial court's refusal to call Ms. Day to the stand. As a result of this refusal to permit Appellant the benefit of his right to compel witnesses in his favor,[17] Appellant was wrongly denied the benefit of either Ms. Day's testimony or any inference from her refusal to testify in light of her complete immunity from prosecution. *See State v. Blake*, 197 W.Va. 700, 709, 478 S.E.2d 550, 559 (1996) (recognizing that "we are obligated to reverse where the improper exclusion of evidence places the underlying fairness of the entire trial in doubt or where the exclusion affects the substantial rights of the defendant"); *see also Harman*, 165 W.Va. at 499, 270 S.E.2d at 150 (recognizing that exclusion of "testimony [that] provides a direct link to someone other than the defen-

---

17. *See supra* note 1.

dant [committing the crime] ... constitutes reversible error"). Based on the specific facts presented by this case, we conclude that it was an abuse of discretion for the trial court not to have called Ms. Day to the stand in connection with Appellant's attempt to exercise his right to compel the testimony of a witness pursuant to article III, section 14 of the West Virginia Constitution, whose testimony, or the inference from her refusal to testify, could have been both material and favorable to his defense.

Based on the foregoing, we reverse the decision of the Circuit Court of McDowell County and remand this matter for a new trial.

Reversed and remanded.

MAYNARD, Justice, dissenting:

(Filed April 10 2007)

Contrary to the majority's opinion, there is no violation of the constitutional right to compulsory process in this case, and the circuit court did not abuse its discretion in refusing the appellant's request to call Ms. Day to the stand.

First, the appellant's right to compulsory process was not violated. Courts have held that "[o]nce a witness appears in court and refuses to testify, a defendant's compulsory process rights are exhausted. It is irrelevant whether the witness's refusal is grounded in a valid Fifth Amendment privilege, an invalid privilege, or something else entirely." *U.S. v. Griffin*, 66 F.3d 68, 70 (5th Cir.1995) (footnote omitted). The court in *Griffin* explained the reason for this rule as follows,

[A] claim of Fifth Amendment privilege is likely to be regarded by the jury as high courtroom drama and a focus of ineradicable interest, when in fact its probative force is weak and it cannot be tested by cross-examination.... Juries are no less likely to draw improper influences from an invalid assertion of privilege than from a valid assertion. In either case, the witness avoids cross-examination.

*Griffin*, 66 F.3d at 70–71 (internal quotation marks and citations omitted). In the instant case, once Ms. Day appeared before the trial court and refused to testify, the appellant's right to compulsory process was satisfied. At that point, the court was under no obligation to compel Ms. Day to take the stand.

However, even if the right to compulsory process was implicated under the facts of this case, Ms. Day's testimony was not required because the appellant made absolutely no showing that her testimony would have been material and favorable to his defense. In its extremely weak analysis of this issue, the majority finds that the requisite showing was made because "there is little question that Ms. Day's testimony could have been both material and favorable to Appellant, had she chosen to testify in open court." Majority opinion at 15. The record is clear that Ms. Day had no intention of testifying in open court. Ms. Day invoked her Fifth Amendment privilege against self-incrimination before the trial court *in camera*. After the trial court found that Ms. Day had no valid Fifth Amendment privilege under these facts, she nevertheless still refused to testify, was held in contempt, and jailed for the duration of the trial. There simply is no reason to believe that Ms. Day, once she took the stand, would have admitted to being solely responsible for the victim's murder.

Second, the trial court did not abuse its discretion in not compelling Ms. Day to take the stand in front of the jury and refuse to testify. Her refusal to testify would have had absolutely no probative value in determining the guilt or innocence of the appellant. On the other hand, it would likely have done substantial harm to the fact-finding process. First, Ms. Day's silence would have led to speculation on the part of the jury. Second, it would have caused the jury to draw improper inferences. The law is clear that "[n]either side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him." *Griffin*, 66 F.3d at 71. Finally, the appellant suffered absolutely no prejudice from the trial court's refusal of his request to call Ms. Day as a witness. Several witnesses testified regarding statements Ms. Day made that implicated her in the victim's murder. Therefore, the appellant was able to present his theory to

the jury that Ms. Day, and not he, murdered the victim.

In sum, the majority opinion has no basis in our constitutional or evidentiary law. Accordingly, I dissent.