[Cite as *State v. Cook*, 2011-Ohio-4391.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

JOHNNIE D. COOK

    Appellant

C.A. No.    25573

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 09 08 2396

DECISION AND JOURNAL ENTRY

Dated: August 31, 2011

DICKINSON, Judge.

INTRODUCTION

{¶1} Someone beat Alan Grna and his elderly mother Julianna Grna to death inside their home on or about July 11, 2009. The Grand Jury indicted Johnnie Cook for the murders because he pawned Mrs. Grna's wedding ring, made calls from Mr. Grna's cellular telephone, was seen driving the Grnas' car, and his DNA was found on items in the Grnas' upstairs bathroom after their deaths. A jury convicted him of aggravated murder, aggravated burglary, grand theft, theft from the elderly, and theft, and the trial court sentenced him to life in prison without the possibility of parole. Mr. Cook has appealed, arguing that the trial court incorrectly denied his motion to suppress, that the court incorrectly denied his motion for judgment of acquittal, and that his convictions are against the manifest weight of the evidence. We affirm because the trial court correctly denied Mr. Cook's motion to suppress, his convictions are

supported by sufficient evidence, and his convictions are not against the manifest weight of the evidence.

## MOTION TO SUPPRESS

**{¶2}** Mr. Cook's first assignment of error is that the trial court incorrectly denied his motion to suppress. A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St. 3d 152, 2003-Ohio-5372, at ¶8. Generally, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id*. But see *State v. Metcalf*, 9th Dist. No. 23600, 2007-Ohio-4001, at ¶14 (Dickinson, J., concurring). The reviewing court "must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Burnside*, 2003-Ohio-5372, at ¶8.

**{¶3}** Mr. Cook moved to suppress the results of DNA testing of evidence obtained from the Grnas' bathroom because the prosecutor did not tell him before testing the evidence that the testing would completely consume the evidence. According to Mr. Cook, the prosecutor acted in bad faith when she failed to notify his lawyer and give him an opportunity to stop the testing before the evidence was destroyed.

**{¶4}** In *California v. Trombetta*, 467 U.S. 479 (1984), the United States Supreme Court held that, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id*. at 488. "To meet this standard . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. at 489. In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the United States Supreme Court

again considered "what might loosely be called the area of constitutionally guaranteed access to evidence." *Id.* at 55 (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867 (1982)). It explained that, while the State has an absolute duty to disclose "material exculpatory evidence," if evidence is only "potentially useful," "unless a criminal defendant can show bad faith on the part of the police, failure to preserve [that] evidence does not constitute a denial of due process of law." *Id.* at 57-58. The parties agree that the evidence destroyed by the DNA testing in this case was only potentially useful.

{¶5}    At a hearing on Mr. Cook's motion, an analyst testified that she usually divides DNA samples in half in case a defendant wants to do his own testing of the sample. Some of the swabs that she received in this case, however, had so little DNA evidence that, in order to get a complete result, it was necessary to consume the entire sample. She testified that, before she runs a test that will consume an entire sample, she obtains written permission from the prosecutor's office. She also testified that she received written permission from the prosecutor in this case and, therefore, proceeded with the tests.

{¶6}    The prosecutor testified the analyst told her that, in light of the number of samples submitted for testing, it was going to take six to eight weeks to get all the results back. She knew that Mr. Cook had already been arrested for another crime and so his speedy trial time was running. She also testified that there were other suspects under investigation and so she wanted to know if she could exclude Mr. Cook from having been in the Grnas' house. She further testified that, because it was going to be a death penalty case and the lawyer who had been appointed for Mr. Cook was not certified to handle such cases, she did not think it was necessary to tell his lawyer about the testing. She denied knowing that the court had appointed for Mr. Cook a new lawyer who was death-penalty certified a few days before she gave permission to the

analyst to consume the samples. According to the prosecutor, if she had known about the new lawyer, she would have called him as a courtesy before allowing the destruction of the DNA evidence.

{¶7} The trial court found that the prosecutor's testimony "strain[ed] credulity." In particular, it noted that the prosecutor could not remember, in over 30 years as a prosecutor, any capital murder cases that had gone to trial as soon as she feared Mr. Cook's might. It also found that the prosecutor had at least constructive notice that Mr. Cook had been appointed a new lawyer. It further noted that, if Mr. Cook's lawyer had moved to delay the DNA testing, the motion would have tolled his speedy trial time. It determined that the prosecutor's "destruction of evidence without notification to defense counsel, particularly in a capital case, was misguided and inexplicable."

{¶8} Despite criticizing the prosecutor's conduct, the trial court determined that Mr. Cook had not demonstrated that his due process rights were violated. Specifically, the court noted that the State had not tested all of the DNA samples, and that for each sample that was consumed, a "similar sample was retained for later analysis." The court found "that comparable evidence to that destroyed has been preserved and is reasonably available to [Mr. Cook]." It concluded that any "possible exculpatory value of the destroyed evidence is minimal given the reasonable availability of comparable evidence" and, therefore, denied Mr. Cook's motion to suppress.

{¶9} Mr. Cook's argument to this Court focuses solely on whether the prosecutor acted in bad faith when she authorized the destruction of DNA samples without notifying his lawyer. Mr. Cook has not contested the court's finding that, despite the destruction of those samples, comparable samples exist to the ones that were destroyed. Moreover, the fact that comparable

samples exist is supported by the record. The prosecutor and analyst testified that they reviewed all of the samples that were submitted for testing and decided that only half of the samples from each source should be consumed, leaving comparable samples for the defendant to test if he desired. Accordingly, in light of the trial court's uncontested finding that similar evidence exists to the evidence that was destroyed, we conclude that the trial court correctly determined that the State did not violate Mr. Cook's access to evidence rights. See *California v. Trombetta*, 467 U.S. 479, 489 (1984) (holding that the destroyed evidence must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means[.]"). Mr. Cook's first assignment of error is overruled.

SUFFICIENCY

{¶10} Mr. Cook's second assignment of error is that the trial court incorrectly denied his motion for judgment of acquittal. Under Rule 29(A) of the Ohio Rules of Criminal Procedure, a defendant is entitled to a judgment of acquittal on a charge against him "if the evidence is insufficient to sustain a conviction . . . ." Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo. *State v. Thompkins*, 78 Ohio St. 3d 380, 386 (1997); *State v. West*, 9th Dist. No. 04CA008554, 2005-Ohio-990, at ¶33. We must determine whether, viewing the evidence in a light most favorable to the prosecution, it could have convinced the average finder of fact of Mr. Cook's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

{¶11} Mr. Cook has not argued that the State failed to present enough evidence to prove that the charged crimes occurred, but rather that it failed to prove that he was the one who committed the crimes. He has noted that investigators found a bloody footprint near Mrs. Grna's body that did not match his shoes and that DNA evidence was found in the house that did not

match him or the Grnas. He has also noted that it was possible that the DNA evidence that matched his profile could also have matched someone else. Furthermore, even if it was his DNA, that would only prove that he was inside the Grnas' house at some point, not that he killed them and stole their possessions.

{¶12} Crime scene investigators testified that whoever killed the Grnas used toilet paper from the upstairs bathroom to clean up blood. An analyst found DNA evidence that was consistent with Mr. Cook's genetic profile inside of a toilet paper roll tube that investigators collected from the upstairs bathroom. The analyst testified that the part of the population that could not be excluded as possible contributors of the DNA was approximately 1 out of 70,000,000 people. For comparison purposes, she noted that the combined population of Ohio and its five adjoining states is 46,000,000.

{¶13} Detectives testified that whoever killed the Grnas also stole guns, cell phones, jewelry, and the Grnas' car. A pawn shop owner testified that, two days after the killings, Mr. Cook pawned a gold ring and necklace at his store. A long-time friend of Mrs. Grna identified the pawned ring as Mrs. Grna's wedding band. A friend of Mr. Cook's testified that, early one morning in July 2009, Mr. Cook tried to buy marijuana from him. According to the witness, when Mr. Cook arrived, he was shaking, appeared nervous, had blood on his shirt, and offered to sell him a gun.

{¶14} Friends and family of Mr. Cook testified that, around the time of the murders, Mr. Cook bought new clothes and jewelry. He allegedly explained his purchases by saying that he had made money selling guns. His friends and family also testified that he started driving a car around the time of the murders that was the same make, model, and color as the Grnas' car. One of his friends offered to buy the car, but Mr. Cook would not sell it to her because he had hit a

motorcycle with the car and considered it "hot." Police testified that, around the time of the Grnas' death, there was a collision between a car and motorcycle in which the car left the scene of the collision before police arrived. A police investigator collected pieces of plastic that appeared to have broken off from the car involved in the collision. When the police finally recovered the Grnas' car, the pieces of plastic that had been recovered from the collision were a perfect match to pieces that were missing from the wheel well of the Grnas' car.

{¶15} Mr. Cook's cousin testified that Mr. Cook regularly spent the night at her house and that there is an unobstructed view of the Grnas' house from her house. Detectives and telecommunications experts also testified that someone used Mr. Grna's cell phone to call Mr. Cook's mother's house after the murders.

{¶16} Although there is no direct evidence that Mr. Cook murdered the Grnas, we conclude there is ample circumstantial evidence to support his convictions. The Ohio Supreme Court has held that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value . . . ." *State v. Jenks*, 61 Ohio St. 3d 259, paragraph one of the syllabus (1991). In some situations, circumstantial evidence may even be "more certain, satisfying, and persuasive than direct evidence." *Id.* at 272 (quoting *State v. Lott*, 51 Ohio St. 3d 160, 167 (1990)). The trial court, therefore, correctly denied Mr. Cook's motion for judgment of acquittal. Mr. Cook's second assignment of error is overruled.

### MANIFEST WEIGHT

{¶17} Mr. Cook's third assignment of error is that his convictions are against the manifest weight of the evidence. His argument focuses, again, on whether he was the one who committed the crimes. According to Mr. Cook, just because he had possession of some of the Grnas' belongings a couple days after the crimes, does not mean he killed and stole from them.

He has argued that other people could have the same DNA profile as he has, including his relatives who lived near the Grnas and could have been in their house. He has also pointed out that there was unidentified DNA material and an unidentified footprint found in the house. He has also argued that, because the court did not give a complicity instruction, his convictions can only be upheld if the evidence supported that he was the principal offender. He has noted, however, that, in response to a death penalty specification, the jury found that he was not the principal offender in the murders. According to Mr. Cook, it is clear that the jury lost its way in attributing the actions of others to him even though it did not receive an instruction on complicity.

{¶18} A jury's findings regarding a specification to a charge of aggravated murder do not have to be consistent with its verdict on the aggravated murder charge itself. *State v. Perryman*, 49 Ohio St. 2d 14, paragraph three of the syllabus (1976). In *Perryman*, the Ohio Supreme Court explained that "one may be convicted of aggravated murder, the principal charge, without a specification. Thus, the conviction of aggravated murder is not dependent upon findings for the specifications thereto. Specifications are considered after, and in addition to, the finding of guilt on the principal charge." *Id*. at 26. The fact that the jury found Mr. Cook guilty of aggravated murder, but found that he was not the principal offender regarding a death penalty specification, therefore, does not necessarily mean that the jury lost its way during its deliberations.

{¶19} As previously noted, there were several witnesses who saw Mr. Cook driving a car with the same description and damage as the Grnas' car soon after the Grnas' deaths. There was also evidence that Mr. Cook pawned Mrs. Grna's jewelry and used Mr. Grna's cell phone to call his mother a few days after the murders. There was also evidence that, whoever committed

the crimes took several guns from the Grnas' house and that Mr. Cook offered to sell guns to friends and told friends and family that he had gotten money from selling guns soon after the murders. Finally, DNA evidence that was consistent with Mr. Cook and only one out of every 70,000,000 people was found in the Grnas' bathroom on the tube of a roll of toilet paper. According to Mrs. Grnas' longtime friend, the Grnas were private people with few friends, suggesting that it would have been very unlikely that Mr. Cook or a close family member had been in their upstairs bathroom so recently as to have left DNA material on a regularly replaced item such as a roll of toilet paper. Furthermore, the fact that Mr. Cook's shoes did not match the ones at the Grnas' house is not persuasive. Witnesses testified that Mr. Cook bought new clothes after the murders and it is possible that his purchases included new shoes. According to the detective who took Mr. Cook's shoes for analysis, they appeared to be fairly new. Upon review of the entire record, we conclude that the jury did not lose its way when it found that Mr. Cook murdered the Grnas and stole their things. His third assignment of error is overruled.

## CONCLUSION

{¶20} The trial court correctly denied Mr. Cook's motion to suppress and his motion for judgment of acquittal. Mr. Cook's convictions are not against the manifest weight of the evidence. The judgment of the Summit County Common Pleas Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CLAIR E. DICKINSON
FOR THE COURT

BELFANCE, P. J.
WHITMORE, J.
CONCUR

APPEARANCES:

MARTHA HOM, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.