PER CURIAM.
¶1 Darwin Davis appeals from a judgment convicting him of four counts of second-degree sexual assault of a child and from an order denying his motion for postconviction relief.[1] Davis raises multiple claims of ineffective assistance of counsel and due process violations. We conclude that Davis has failed to demonstrate prejudice on any of the ineffective assistance of counsel claims, and that each of the due process claims was either forfeited or lacks merit. Accordingly, we affirm the judgment and the order of the circuit court.
BACKGROUND
¶2 The sexual assault charges against Davis were based upon allegations that he had an ongoing sexual relationship with a fifteen-year-old girl, Jane.[2] The State subsequently brought additional charges against Davis, including two counts of contributing to the delinquency of a child based upon allegations that Davis directed his children to lie in connection with this case.
¶3 Davis owned the Final Lap Sports Bar and Grill in Shawano. Jane visited the bar sometimes because her father lived in an apartment above it. Jane said that Davis began flirting with her at the bar, touching her while playing pool with her, and telling her that he liked what she was wearing. Eventually, Davis gave Jane a cell phone, which she hid from her mother. Davis sent sexual text messages to Jane on the phone and told her to delete the messages after reading them. When police confiscated the secret phone from Jane, they found Davis's phone number in Jane's contacts under a pseudonym and found the secret phone's number listed in Davis's contacts as "To Sexy."
¶4 Jane testified that one day she went to the bar when it was closed, and she and Davis had vaginal intercourse on a couch in the basement of the bar. DNA testing by the State Crime Lab showed that Davis was a possible contributor to semen stains on that couch and that a spot of female biological material on the couch was consistent with Jane's DNA profile.
¶5 Davis asked Jane to babysit for his thirteen-year-old daughter and ten-year-old son on Saturday nights, so that Davis and Jane would have an excuse to see one another. Davis's children were alone on other nights of the week without needing a babysitter. Jane testified that she variously had vaginal, oral and anal sex with Davis about two dozen times in his house while she was babysitting, all when she was fifteen years old. Jane and Davis's daughter both testified that Davis's daughter once observed, through a window, Davis performing oral sex on Jane.
¶6 Davis later admitted to his daughter that he had sexual contact with Jane because he was lonely and her mother was not there. Davis told his daughter that if she testified against him and he went to jail, he would kill himself. Davis also asked his daughter to falsely say that she had seen Jane looking through his trash can for condoms, so that he could explain away the DNA evidence that had been found.
¶7 When asked if Davis had any distinguishing marks on his body, Jane stated that Davis had a tattoo on his back and that his stomach looked "a bit different" due to stomach surgery. Jane said that she did not really know how to describe Davis's abdomen other than that it "bulges a little more than normal," and she could not remember "if there is a certain scarring." Jane explained that she did not initially tell police about the scarring on Davis's stomach because they had asked her only whether there was anything about Davis "below the waistline" that she could identify, but she said that she had "always known" about the condition of his stomach.
¶8 Davis sought permission to take off his shirt in the courtroom to show the jury the extent of the disfigurement on his abdomen. Alternatively, Davis wished to present a photograph that had been taken in counsel's office while the case was pending, but that had not been turned over to the State prior to trial. Davis contended that his picture or a viewing of his abdomen would show that the scarring was considerably more severe than Jane had testified. The circuit court denied the request, and it limited Davis to introducing an eight-by-ten-inch photograph of himself without a shirt that had been taken when Davis was booked into jail following his arrest for the underlying charges.
¶9 Robert Szekeres occasionally worked as a disc jockey at the Final Lap bar, and he also patronized the establishment. Szekeres testified he observed Davis interacting with Jane at the bar. Szekeres thought the flirting between the two was "a little weird" and inappropriate due to their age difference.[3] During one conversation, Davis admitted to Szekeres that he had sexual relations with Jane. Davis then asked Szekeres to investigate for him if there were any "nonextraditional" countries where Davis could go "if shit hit the fan."
¶10 Szekeres's wife, Heather Szekeres, also worked at the bar for a time. Szekeres testified that on a separate occasion Davis asked Szekeres and Heather to tell the police that Davis had been having an affair with Heather during the time frame of the alleged assaults, so that "it wouldn't look like he was doing anything with [Jane]." Szekeres said that he went along at first, but that he finally told the police the truth because his conscience was bothering him.
¶11 Heather's mother, Laurie Waddell, also worked at the bar, and she observed what she characterized as "touchy feeling" behavior by Davis toward Jane. After Waddell became aware that the police were investigating Davis's relationship with Jane, Waddell confronted Davis about it, and Davis admitted that he had sexual encounters with Jane. Davis asked Waddell to be "on his side" and told her that if she did not continue to support him and lie for him, he would commit suicide.
¶12 Heather disappeared in June of 2013, while the charges against Davis were pending, and her dead body was discovered the following year. Prior to trial, the circuit court granted a motion in limine prohibiting the State from introducing or mentioning any evidence related to an ongoing investigation into Heather's homicide. When Davis took the stand in his own defense, the prosecutor asked him why Heather's husband, her mother, and Davis's daughter would testify that Davis had admitted to them that he had sex with Jane. Davis responded that Heather had "come up missing" and that Heather's husband and mother believed he had something to do with it.
¶13 Davis's response triggered the following exchange with the prosecutor:
Q. So you said-you're telling us that Robert Szekeres reported that you had admitted to having sex with [Jane] because you were a suspect in the death of his wife Heather?
A. No. I do believe when he had stated that, I had fired Heather from the bar. She was DJ'ing, drinking back by my equipment in April, and after that weekend when I had my son start working for me, they went up to the police department and made these accusations after I had fired her.
Q. You're aware that Heather didn't disappear until June of 2013; correct?
A. Correct.
Q. You're aware that you're the last person who saw her in June of 2013?
A. No, I'm not.
Q. You're aware that her body was found nearly a year later dead; correct?
A. Correct.
Q. You're aware that she had given a statement against you; correct?
A. That was way before she was giving the statement to my attorney for me.
Defense counsel offered no objection to any of these questions. In closing argument, the prosecutor suggested that Heather's disappearance did not provide Szekeres a motive to falsely accuse Davis of sexually assaulting Jane because Szekeres made his accusation months before Heather went missing.
¶14 The first attorney appointed to represent Davis, Henry Schultz, withdrew from representing Davis after the additional charges were filed because of the possibility that Schultz might have to testify at trial regarding false statements Davis's children had made to him.[4] However, on the second day of trial, the prosecutor informed the circuit court that it could release Schultz from his subpoena because the State was not going to call him. The State had instead decided to rely solely upon the testimony of Davis's children for the charges of contributing to the delinquency of a minor.
¶15 After Schultz was released from his subpoena, Davis's trial counsel attempted to consult with him regarding Davis's defense. The circuit court permitted Schultz to attend an in-chambers conference during trial and to meet with Davis and his trial counsel at the jail if jail personnel had no objection. However, the court prohibited Schultz from passing messages to Davis's trial counsel during testimony. The court reasoned that such messages constituted "active strategy" that could be used to develop lines of questioning, and told Schultz that it did not want him "acting as a second attorney."
¶16 The jury found Davis guilty on all counts. After the circuit court sentenced Davis, he filed a postconviction motion alleging several instances of ineffective assistance of counsel and multiple violations of his right to a fair trial. The circuit court denied the motion following an evidentiary hearing, and Davis now appeals.
DISCUSSION
Ineffective Assistance of Counsel
¶17 Davis raises three claims of ineffective assistance of counsel on appeal. First, Davis asserts that his trial counsel should have objected when the prosecutor questioned Davis about his possible connection to the disappearance and death of Heather Szekeres. Second, Davis asserts that his counsel should have called as a witness an investigator who would have testified that Heather had claimed to be having an affair with Davis during the same time period the State alleged Davis was having a relationship with Jane. The investigator's report said Heather stated there were times she had sex with Davis while Jane was babysitting and sleeping on the couch. Third, Davis asserts that his counsel should have introduced a photograph of a text message Davis claims was sent from Szekeres's phone to Davis's phone. Davis argues the text message would show that Szekeres "knew the whole time" that Heather was having an affair with Davis. Accordingly, it would have undermined Szekeres's testimony that Davis had asked Szekeres and Heather to lie about the existence of an affair.
¶18 A claim of ineffective assistance of counsel requires the defendant to show two things: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance. State v. Swinson , 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12. We will not set aside the circuit court's factual findings about what actions counsel took or the reasons for them unless they are clearly erroneous. State v. Pitsch , 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985). However, whether counsel's conduct violated the constitutional standard for effective assistance of counsel is ultimately a legal determination that this court decides de novo. Id. We need not address both components of the test if the defendant fails to make a sufficient showing on one of them. Swinson , 261 Wis. 2d 633, ¶58.
¶19 A defendant proves prejudice by demonstrating there is a "reasonable probability" that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. Strickland v. Washington , 466 U.S. 668, 694 (1984). The reasonable probability standard does not require a showing that it is "more likely than not" that a jury would have acquitted the defendant if counsel had acted differently. State v. Sholar , 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citing Strickland , 466 U.S. at 693 ). Still, the reasonable probability standard is tied to the reviewing court's confidence in the outcome, and the "likelihood of a different result must be substantial, not just conceivable." Id. , ¶45; Harrington v. Richter , 562 U.S. 86, 111-12 (2011) (citing Strickland , 466 U.S. at 693 ). Thus, there is no reasonable probability of a different result based on alleged errors by counsel in a criminal trial when the conviction was otherwise supported by overwhelming evidence. Sholar , 381 Wis. 2d 560, ¶58.
¶20 Here, we conclude that there is no reasonable probability that any of the actions Davis alleges his counsel should have taken would have resulted in a different outcome because there was overwhelming evidence that Davis had a relationship with Jane that began with inappropriate "grooming" behavior and culminated in multiple sexual acts. In particular, Jane's substantially consistent testimony to that effect was strongly corroborated by: (1) the DNA evidence on the couch in the basement of the bar where Jane testified that the first sexual encounter had occurred; (2) the existence of the secret cell phone Jane testified Davis had given her, as well as evidence that the cell phone's number was identified as "To Sexy" in Davis's phone, and that Davis had urged Jane to delete messages on that phone; (3) the testimony of Davis's daughter, who witnessed one of the sexual encounters that occurred in Davis's home; and (4) two other witnesses having testified to observing Davis's "weird" and "touchy feeling" grooming behavior with Jane. The foregoing evidence was nearly certain to have resulted in conviction, even without the additional testimony from Szekeres and Waddell that Davis had admitted to them that he had a sexual relationship with Jane.
¶21 Regarding the prosecutor's questions in violation of the motion in limine, we are not persuaded that they were unduly prejudicial when considering the context in which they were made. Namely, Davis himself first suggested that suspicions over his possible involvement in Heather's disappearance and death could provide motive for Szekeres and Waddell to testify falsely against him.
¶22 Finally, the statements Heather made to the investigator and the text message Szekeres sent to Davis both relate to the question of whether Davis was having an affair with Heather. However, because having an affair with Heather would in no way have precluded Davis from also having a sexual relationship with Jane, the relevance of the additional information Davis believes should have been introduced is marginal at best. Additionally, both pieces of evidence would have been cumulative to other evidence from the trial on the issue of the alleged affair. In sum, our confidence in the outcome of Davis's trial is not undermined by any of the alleged errors made by Davis's trial counsel.
Due Process
¶23 Davis raises three additional claims under the umbrella assertion that he was denied his due process right to a fair trial. Specifically, Davis contends: (1) the circuit court denied him his right to counsel of his choice when it limited the ability of Schultz to assist in his defense at trial; (2) the court denied him his right to present a defense when it limited him to introducing the booking photograph of his abdomen; and (3) the violation of the motion in limine regarding the disappearance and death of Heather Szekeres constituted prosecutorial misconduct. We will address each contention in turn.
¶24 First, we conclude that Davis has forfeited any claim that the circuit court violated his constitutional right to counsel of his choice. We will generally not consider issues raised for the first time on appeal, so that we do not "blindside trial courts with reversals based on theories which did not originate in their forum." See Schonscheck v. Paccar, Inc. , 2003 WI App 79, ¶¶10-11, 261 Wis. 2d 769, 661 N.W.2d 476. Moreover, a party "must raise an issue with sufficient prominence that the trial court understands that it is called upon to make a ruling." Schwittay v. Sheboygan Falls Mut. Ins. Co. , 2001 WI App 140, ¶16 n.3, 246 Wis. 2d 385, 630 N.W.2d 772. Here, Schultz never filed a new notice of retainer after he had withdrawn from representation, and Davis never explicitly asked the court to reinstate Schultz as counsel or co-counsel of record. If Davis had clearly raised the question of whether Schultz could have been reinstated as counsel or co-counsel of record, the court could have addressed the issue at the time. In the absence of any such request, we see no reason why the court could not properly treat Schultz as any other expert assisting in the defense, and place limitations upon his participation in court accordingly.
¶25 Similarly, because Davis failed to contemporaneously object to the prosecutor's violation of the motion in limine, Davis has forfeited his right to directly raise that issue on appeal. Rather, our review of that issue is limited to the context of ineffective assistance of counsel. We have already explained why the claim fails in that framework.
¶26 That leaves Davis's claim that he was prevented from presenting a complete defense when the circuit court denied his request to show his abdomen to the jury, or to introduce a picture of his abdomen taken by the defense team during the pendency of the case. The admissibility of evidence is subject to multiple layers of analysis. First, evidence is not admissible unless it is relevant-meaning that it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." WIS. STAT. §§ 904.01 and 904.02. Next, evidence that has some relevance may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." WIS. STAT. § 904.03.
¶27 A defendant's right to present a defense may in some cases require the admission of testimony that would otherwise be excluded under applicable evidentiary rules. State v. Pulizzano , 155 Wis. 2d 633, 648, 456 N.W.2d 325 (1990) ; see also State v. Jackson , 216 Wis. 2d 646, 663, 575 N.W.2d 475 (1998). Nonetheless, the right to present a defense through confrontation and compulsory process is not absolute, but rather it is limited to the presentation of relevant evidence whose probative value is not substantially outweighed by its potential prejudicial effect. Jackson , 216 Wis. 2d at 656-57. Additionally, in order to warrant a new trial, a defendant must show that a violation of the confrontation clause or compulsory due process clause "completely" prohibited him or her from exposing a witness's bias or motive for testifying falsely, or deprived the defendant of material evidence so favorable to his or her defense as to "necessarily" prevent the defendant from having a fair trial. United States v. Manske , 186 F.3d 770, 778 (7th Cir. 1999) ; United States v. Valenzuela-Bernal , 458 U.S. 858, 872 (1982).
¶28 Here, the circuit court determined that a showing of Davis's abdomen at trial or the introduction of a defense photograph taken during the pendency of the case would be less relevant than a booking photograph that had been taken much closer in time to when Jane would have seen Davis's abdomen. In addition, Davis was allowed to testify about the condition of his abdomen, and Jane did not deny Davis had scarring on his abdomen. Instead, she testified she had "always known" about the condition of his stomach. We therefore conclude both that the circuit court reasonably exercised its discretion as to the exclusion of evidence on relevancy grounds, and that Davis was not completely prohibited from raising the issue at trial.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

There was a companion judgment imposing jail time on four misdemeanor charges and a Class I felony, but Davis did not identify that judgment in his notice of appeal, and he does not develop any arguments specifically relating to the charges in that judgment.

This matter involves the victim of a crime. Pursuant to Wis. Stat. Rule 809.86(4) (2017-18), we use a pseudonym instead of the victim's name. All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Davis was forty-five years old at the time.

A second attorney was forced to withdraw for the same reason, but his representation is not at issue on this appeal.